**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARK CAIRNS, | : | |
| *Plaintiff,* | : | |
| vs. | : | **CIVIL ACTION** |
| | : | |
| HIBU PLC, HIBU INC., MIKE POCOCK, | : | |
| TONY BATES, BOB WIGLEY, | : | **NO.: 2:14-cv-05671** |
| ELIZABETH G. CHAMBERS,  JOHN | : | |
| COGHLAN, TOBY COPPEL, CARLOS | : | |
| ESPINOSA de los MONTEROS, | : | |
| KATHLEEN FLAHERTY, RICHARD | : | |
| HOOPER and BOB GREGERSON, | : | |
| *Defendants.* | : | |

**ORDER**

AND NOW, this            day of                                , 2016, upon

consideration of Defendants' Motion for Summary Judgment (Doc. 39), the Plaintiff's response

and any oral argument, it is hereby ORDERED that the motion is DENIED.

BY THE COURT:

_____
N. I. QUINONES ALEJANDRO, U.S.D.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARK CAIRNS, | : | |
| *Plaintiff,* | : | |
| vs. | : | **CIVIL ACTION** |
| | : | |
| HIBU PLC, HIBU INC., MIKE POCOCK, | : | |
| TONY BATES, BOB WIGLEY, | : | **NO.: 2:14-cv-05671** |
| ELIZABETH G. CHAMBERS,  JOHN | : | |
| COGHLAN, TOBY COPPEL, CARLOS | : | |
| ESPINOSA de los MONTEROS, | : | |
| KATHLEEN FLAHERTY, RICHARD | : | |
| HOOPER and BOB GREGERSON, | : | |
| *Defendants.* | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Respectfully submitted:

**HAINES & ASSOCIATES**

*/s/ Clifford E. Haines*_____
CLIFFORD E. HAINES
DANIELLE M. WEISS
The Widener Building, 5th Floor
1339 Chestnut Street
Philadelphia, PA 19107
*Attorneys for Plaintiff*

Dated: April 25, 2016

## **TABLE OF CONTENTS**

I.   COUNTERSTATEMENT OF FACTUAL BACKGROUND ...........................................1

    A.   Mark Cairns' Employment History at hibu (or Its Predecessor Entities). ...............1

    B.   hibu's Declining Financial Condition. ....................................................................1

    C.   hibu "Investigates" Cairns and Others Via Project Green. ......................................2

    D.   hibu's CEO Circulates Defamatory Email...............................................................6

    E.   hibu Fabricated Cause to Terminate Cairns to Avoid Paying Him Severance. ........6

    F.   The Defamatory Statement Reached Thousands, Even Outside of hibu. ..................7

II.   LEGAL ARGUMENT...................................................................................................8

    A.   Legal Standard .......................................................................................................8

    B.   Plaintiff's Claim for Violation of the WPCL Survives Summary Judgment............9

    C.   Plaintiff's Claim for Defamation Survives Summary Judgment. ...........................10

        1.   hibu's defamatory statement about Cairns is not conditionally
           privileged, but even if it were, such privilege was abused. ......................13

        2.   The defamatory statements made about Cairns in the email are
           defamatory per se; therefore proof of damages is not required and
           damages are presumed. .............................................................................16

        3.   There is a genuine issue of material fact regarding the truth of any
           statement contained in the email; therefore a jury must decide whether
           any part of the statement is true. ...............................................................19

III.   CONCLUSION...........................................................................................................22

i

# TABLE OF AUTHORITIES

## Cases

*Agriss v. Roadway Express, Inc.*, 483 A.2d 456 (Pa. Super. 1984) ............................................... 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................... 8

*Bakare  v. Pinnacle Health Hosp., Inc.,* 469 F. Supp. 2d 272 (M.D. Pa. 2006) .............. 11, 16, 17

*Beverly Enterprises, Inc. v. Trump,* 182 F.3d 183 (3d Cir. 1999) ................................................. 17

*Bogash v. Elkins,* 405 Pa. 437 (1962) ........................................................................................... 12

*Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765 (3d Cir. 2009) ................................................... 8

*Brophy v. Phila. Newspapers, Inc.*, 422 A.2d 625 (Pa. Super. Ct. 1980) .............................. 12, 13

*Byrd v. Sacco,* 2006 Phila. Ct. Com. Pl. LEXIS 291 (Pa. C.P. 2006) .......................................... 15

*Daywalt v. Montgomery Hosp.,* 573 A.2d 1116 (Pa. Super. Ct. 1990) .......................................... 14

*Devon Robotics v. Deviedma,* 2009 U.S. Dist. LEXIS 112077 (E.D. Pa. Nov. 30, 2009) ........... 11

*Doe v. Luzerne County*, 660 F.3d 169 (3d Cir. 2011) ..................................................................... 8

*Fanelle v. LoJack Corp.,* 79 F. Supp. 2d 558  (E.D. Pa. 2000) .............................................. 11, 19

*Gray v. York Newspapers, Inc.*, 957 F.2d 1070 (3d. Cir. 1992) ..................................................... 8

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) ................................ 18

*Kaucher v. County of Bucks*, 455 F.3d 418 (3d Cir. 2006) ............................................................. 8

*Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072 (3d Cir. 1985) .......................... 18

*Miketic v. Baron,* 450 Pa. Super. 91 (Pa. Super. Ct. 1996) .................................................... 13, 14

*Moore v. Cobb-Nettleton,* 2005 PA Super 426 (Pa. Super. Ct. 2005). ......................................... 14

*Mzamane v. Winfrey,* 693 F. Supp.2d 442 (E.D. Pa. 2010) .................................................... 11, 12

*New York Times v. Sullivan*, 376 U.S. 254 (1964) ........................................................................ 18

*OptimisCorp. v. Waite*, 2015 Del. Ch. LEXIS 222, (Del. Ch. Ct. Apr. 30, 2015) ................ 20, 21

*Paul v. Davis,* 424 U.S. 693 (1976) ................................................................. 16

*Regis Ins. Co. v. A.M. Best Co.,* 2013 U.S. Dist. LEXIS 28006 (E.D. Pa. Mar. 1, 2013) ........... 11

*Sarkees v. Warner-West Corp.,* 349 Pa. 365 (1944) ............................................ 12

*Sias v. General Motors Corp.,* 372 Mich. 542 (Mich. 1964) .................................... 15

*St. Amant v. Thompson*, 390 U.S. 727 (1968) ................................................. 18

*St. Amant v. Thompson,* 390 U.S. at 732 ..................................................... 18

*Stoeckinger v. Presidential Fin. Corp. of Delaware Valley*, 948 A.2d 828 (Pa. Super. 2008)..... 13

*Thomas Merton Ctr. v. Rockwell Int'l Corp.,* 497 Pa. 469 (1981)............................... 12

*Tucker v. Phila. Daily News*, 848 A.2d 113 (Pa. 2004) ....................................... 12

**Statutes**

18 U.S.C. § 1831 ............................................................................. 14

42 Pa. C.S. § 8343(a) ....................................................................... 11

43 Pa.C.S. § 260.1 ........................................................................... 9

43 Pa.C.S. § 260.3 (b) ....................................................................... 9

**Other Authorities**

*Comment, Collateral Estoppel in Pennsylvania*, 10 Duquesne L. Rev. 650 (1972).................... 13

*Restatement of Judgments* § 70 (1942) ....................................................... 13

SSJI (civ) § 17.180B ........................................................................ 18

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................ 8

Plaintiff Mark Cairns hereby files this Memorandum of Law in Opposition to the Defendants' Motion for Summary Judgment (Doc. 39). There are myriad genuine issues of material fact to be resolved by a jury. Accordingly, the motion should not be granted.

## I.   COUNTERSTATEMENT OF FACTUAL BACKGROUND

### A.   Mark Cairns' Employment History at hibu (or Its Predecessor Entities).

In February 1984, Plaintiff Mark Cairns began his long-term employment with the company known today as hibu Inc., which has offices in King of Prussia, Pennsylvania, among other locations within the United States. hibu Inc. is a wholly owned subsidiary of hibu, PLC, which is based in the United Kingdom.[1] hibu is a print and digital media company with operations worldwide and is the company formerly known as Yellowbook. Mr. Cairns was continuously employed at hibu (or one of its predecessor entities) from February 1984 until March 6, 2013, at which time he was terminated. At the time of Mr. Cairns termination, he was the Head of Operations of the US/UK operations. Cairns had held this position since 2011. (Exhibit A, Cairns Dep. Tr., 180:20-181:6).

### B.   hibu's Declining Financial Condition.

In March 2013, when Cairns was terminated, hibu was in poor financial condition. (Exhibit F, Dep. Tr., Bates, 38:14-39:2). Indeed, it was in the midst of a process in the UK similar to a business reorganization in US Bankruptcy Court. (Exhibit C, Dep. Tr. Michael Pocock, 58:3-7; 14:22-25). A coordinating committee ("CoCom") was put into place to negotiate and facilitate the repayment of hibu's debt to its 300 lenders. (Exhibit D, Dep. Tr. Christian Wells, 63:21-65:5; Exhibit F, Dep. Tr. Bates, 41:11-16). All strategic decisions were run through CoCom and its advisors. This included an aggressive forecast for generating

---

[1] hibu is used interchangeably to refer to hibu Inc. and hibu, PLC. When the particular entity is being referred to specifically and in a legally significant way, the specific entity name will be used.

revenue at hibu.  (Exhibit C, Dep. Tr. Pocock, 74:24-83:5).  These initiatives were a failure.  hibu PLC is now in administration (the UK equivalent of bankruptcy).  (Exhibit H, Dep. Tr. Hooper, 40:18-41:4).

Cairns was not shy about voicing his concerns regarding the efficacy of Pocock's plan to generate increased digital revenue at hibu.  (Exhibit A, Dep. Tr. Cairns, 38:20-39:3; 187:4-189:7; 222:16-224:8).  Cairns was fiercely protective of hibu and wanted nothing more than for it to succeed, but did not believe Pocock's plan would work.  (Exhibit A, Dep. Tr. Cairns, 38:20-39:3).  Indeed, it was revealed after Cairns was terminated that the only programs in place at the time of his employment that generated any revenue for hibu US at all were those business lines on which he worked and which were in placed before Pocock came on board at hibu.  Cairns loyalty ran, as it should have, to hibu and its stakeholders.  (Exhibit H, Dep. Tr. Hooper, 39:21-41:4).

**C.    hibu "Investigates" Cairns and Others Via Project Green.**

Cairns was terminated as a result of an investigation into potential corporate disloyalty known as Project Green, conducted for hibu by Malcolm Green and Christian Wells.  Essentially, hibu believed that Cairns' ongoing communications with former hibu Inc. CEO, Joe Walsh, his personal mentor and friend, were evidence that Cairns was passing sensitive corporate information to Walsh, an outsider.  But, hibu witnesses confirm that hibu was aware that Walsh was in communication with representatives of CoCom and was preparing to make a third attempt to purchase the hibu US business.  (See, Exhibit K, interview of Patti Seda; Exhibit C, Dep. Tr. Pocock, 38:20-41:13; 86:16-89:18).  Walsh was, in fact, in contact with representatives of CoCom in February/March 2012.  (See, Exhibit L, Affidavit of Joe Walsh).

Indeed, in connection with the "investigation" into the conduct of Mr. Cairns and Mr. McCusker putatively leading to their termination, called Project Green (named for the

2

investigator Malcolm Green), no employee interviewed identified Cairns or McCusker as a source of information being allegedly leaked to Walsh.  For example, Patti Seda, the Director of Human Resources at hibu, confirmed that she herself (as were other senior managers) aware that CoCom was in communication with Joe Walsh and that he was preparing to make another attempt to purchase hibu US.  She says she learned this information directly from Christian Wells, hibu's general counsel in the UK.  (See, Exhibit K).  Then hibu CEO, Pocock also admitted at his deposition that he was aware that Walsh was in touch with representatives of CoCom.  (Exhibit C, Dep. Tr. Pocock, 38:20-41:13; 86:16-89:18).

Notably, Ms. Seda also confirmed that she was in regular contact with Joe Walsh, as well as another former CEO of the company.  (Exhibit K).  Yet, she was not terminated in connection with Project Green.  Ms. Seda's interview is important for three reasons: 1) she is the only other person besides Cairns and McCusker who was interviewed on March 6, the termination dates; 2) she establishes that it was known throughout the company by senior management that Joe Walsh was interested in preparing a purchase offer and that Joe Walsh was in touch with CoCom in that regard; and 3) a direct source of information about Joe Walsh and his potential plans was hibu's counsel, Christian Wells, a participant in the investigatory interview.  (Exhibit K).  In other words, neither Cairns nor McCusker was disseminating any information that was not coming also from hibu's investors/advisors and/or hibu's attorney—sources other than Cairns or McCusker.

The "investigation" into this alleged disloyal conduct was anything but thorough.  Indeed, prior to the termination of Cairns' employment, it consisted of fewer than ten interviews of hibu employees and resulted in the identification of no documents supporting the conclusion that Cairns was the source of confidential information to Walsh.  (Exhibit D, Dep. Tr. Wells, 182:4-

183:25, Exhibit E, Dep. Tr. Malcolm Green,; Exhibit J, notes of employee interviews {other than Patti Seda}). None of Cairns' team was interviewed. (Exhibit E, Dep. Tr. Malcolm Green, 73:4-19). This is remarkable given that, according to Pocock, Cairns led the largest team in the US outside of sales. (Exhibit C, Dep. Tr. Pocock, 111:22-112:2). With the exception of the interview with Ms. Seda, Cairns and McCusker, none of these employee interviews was conducted on or before March 6, 2013, the day Cairns was terminated. (Exhibit J, Exhibit K).

The only potential "evidence" of disloyalty offered by anyone at hibu is a putative analysis of the number of telephone communications between Cairns and Joe Walsh created by hibu IT. (Exhibit D, Dep. Tr. Wells, 182:4-183-5; Exhibit E, Dep. Tr. Malcolm Green, 97:4-99:6). But, again, the investigation did not lead to any information regarding the substance of any call between Cairns and Walsh. Indeed, Cairns viewed Walsh as a mentor and personal friend. Indeed, the defendants cite as evidence to their motion, at least one email in which Mr. Walsh invited Mr. Cairns and his wife to join him at a social outing. See, Defts. Memo at Ex. 21. There is no dispute here that Cairns and Walsh were former colleagues and have remained socially friendly in the months surrounding Cairns' termination from hibu. These calls identified on a call log could just as easily be benign social calls than calls of any nefarious or disloyal nature. For purposes of this motion, they must be viewed as such.

Christian Wells and Malcolm Green, had little more than phone records establishing that Cairns and McCusker had either placed or received calls to/from Joe Walsh. (Exhibit D, Dep. Tr. Wells, 182:4-183-5,  Exhibit E, Dep. Tr. Malcolm Green, 97:4-99:6). They had no evidence regarding what, if anything, was said on the calls or the nature of the calls. (Exhibit D, Dep. Tr. Wells, 182:4-183-5, Exhibit E, Dep. Tr. Malcolm Green, 97:4-99:6). No person who has been deposed in this case has had knowledge of any specific information that was passed from Cairns

4

to Joe Walsh.  (Exhibit D, Dep. Tr. Wells, 182:4-183-5, Exhibit E, Dep. Tr. Malcolm Green, 97:4-99:6, Exhibit C, Dep. Tr. Pocock, 108:12-24, Exhibit F, Dep. Tr. Tony Bates, 61:21-62:2; Exhibit G, Chris Wilmot 12:15-20, 24:5-17; Exhibit H, Richard Hooper, 31:23-33:21; Exhibit I, Bryan Turner, 87:20-88:24)

Indeed, Green's own testimony belies that there is or ever was any evidence to support that Cairns was disloyal to hibu Most of the interviews in connection with Cairns' termination took place after he was already terminated. (Exhibit E, Dep. Tr. Malcolm Green, 75:7-78:4). Green even admitted one interviewee, John Butler, suggested CoCom was feeding information to Joe Walsh and he did not believe any information was coming from any hibu employee. (Exhibit E, Dep. Tr. Malcolm Green, 84:3-88:17).  Finally, Green admitted at his deposition that he is unaware of any evidence that Cairns gave any confidential information to Joe Walsh.  (Exhibit E, Dep. Tr. Malcolm Green, 97:4-99:6).

Nonetheless, Cairns was terminated.  Pocock testified that Cairns' termination was approved by the Board of Directors. (Exhibit C, Dep. Tr. Pocock, 97:2-105:21). But, a then-board member, Richard Hooper, testified at this deposition that he did not recall that the board gave instruction to terminate Cairns nor was it asked to approve Cairns' termination.  (Exhibit H, Dep. Tr. Richard Hooper, 26:25-27:12).  Given that the investigation appears not to have started before March 6, 2013, it is nearly impossible to believe that Pocock obtained Board approval for the termination of Cairns or McCusker before the decision was made to do so.

Cairns was never disloyal to hibu.  He did nothing to actively undermine the authority of Pocock, even if he did not like Pocock, his plans, or his leadership style.  (Exhibit A, Dep. Tr. Cairns, 89:15-92:16, 187:4-189:7). As evidenced by the attempts to attract a purchase offer from Walsh, at or about the time Cairns was terminated, the CoCom was clearly dissatisfied with

Pocock's plans and had limited faith in Pocock's abilities to remove hibu from financial crisis. There is simply no evidence that undivided loyalty to Pocock was a necessary requirement for corporate loyalty to hibu or that Cairns was ever disloyal to hibu.

### D.   hibu's CEO Circulates Defamatory Email.

On March 6, 2013, then hibu CEO, Michael Pocock, disseminated an email to all employees of hibu US and the Senior Management Team, roughly 3,000 people.  (See, Exhibit B, email dated March 6, 2013; Exhibit D, Dep. Tr. Christian Wells, ).  The email states that "following a thorough investigation into conduct by them that the company considered to be disloyal and against the interests of its employees and other stakeholders," Mark Cairns and another member of the Senior Manager, Jim McCusker were terminated effective immediately. (Exhibit B).

This email forms the basis of Cairns' defamation claim against hibu.  Indeed, it was widely disseminated to thousands of hibu employees in the US (and to senior executives in the UK), alleging that Cairns engaged in corporate disloyalty.  (Exhibit D, Dep. Tr. Christian Wells,41:14-42:24).  This is a particularly offensive accusation given that Cairns had been employed at the company (or a predecessor) for nearly 30 years.

### E.   hibu Fabricated Cause to Terminate Cairns to Avoid Paying Him Severance.

Indeed, hibu had an incentive to terminate Cairns for cause.  Although hibu appears to steadfastly dispute the terms of Cairns' employment and the existence of either a written contract or a contract by implication, Mr. Wells, hibu's general counsel, testified at his deposition that Mr. Cairns and Mr. McCusker (who hibu admits was subject to an employment contract), were employed under the exact same terms of employment and Cairns' severance rights would be measured and distributed using the same method as McCusker. (Exhibit D, Dep. Tr. Christian

Wells, 52:2-56:10; Exhibit F, Dep. Tr. Tony Bates, 69:17-70:21).  Thus, Green and Wells perhaps initiated Project Green in order to fabricate cause in order to rid the company of two senior level executives who were fiercely loyal to hibu, but who were not particularly loyal to Pocock.  Indeed, replacing these executives served only Pocock's interests.  Under the practice in place at hibu, Cairns was entitled to five weeks pay, plus a week of pay for every year of service to the company on the occasion of his termination. Exhibit F, Dep. Tr. Tony Bates, 69:17-70:21). This is entirely consistent with Cairns' deposition testimony regarding the pattern of practice with respect to severance pay in the hibu US offices.  (Exhibit A, Dep. Tr. Cairns, 147:20-177:1).

     **F.**    **The Defamatory Statement Reached Thousands, Even Outside of hibu.**

     Mark Cairns has been forced to spend time and energy to repair his reputation after the statements in the email disseminated on March 6, 2013 were made publically available.  Indeed, shortly after the announcement of his termination, Cairns received emails from people outside of the hibu organization sending links to a blog post announcing Cairns' termination for cause. (Exhibit A, Dep. Tr. Cairns, 33:18-58:1). After his termination, Cairns attempted to help a company called Access Holdings attract investors.  He'd be asked questions about his termination from hibu at investor meetings in a disapproving way.  (Exhibit A, Dep. Tr. Cairns, 33:18-58:1).  He also had trouble attracting the assistance of a headhunter when looking for a new job after his termination, at least in part, because of the allegations made about him by hibu, which were posted on the internet.  (Exhibit A, Dep. Tr. Cairns, 33:18-58:1).  It took until October 2014 for Cairns to get a job in his field for a real salary. (Exhibit A, Dep. Tr. Cairns, 107:6-108-23).

     Cairns also lost friendships over the defamatory statements made about him.  He made an effort to renew the friendships, but there has been no response to his attempts to reinvigorate the friendships.  ((Exhibit A, Dep. Tr. Cairns, 66:18-68:15).

## II.     LEGAL ARGUMENT

Cairns' complaint states two claims against hibu: Violation of the Pennsylvania Wage Payment and Collection Law (Count I); and Defamation (Count II).  hibu argues in its motion for summary judgment that each of the Cairns' claims fails as a matter of law. However, hibu ignores myriad fact issues which, if proved at trial, would entitle Cairns to relief.  Therefore, the motion for summary judgment must be denied.

### A.     Legal Standard

Summary judgment is appropriate only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "genuine dispute" exists only "if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))).  Moreover, "a factual dispute is 'material' only if it might affect the outcome of the suit under governing law."  *Doe v. Luzerne County*, 660 F.3d 169, 175 (3d Cir. 2011) (citing *Gray v. York Newspapers, Inc*., 957 F.2d 1070, 1078 (3d. Cir. 1992)).  At the summary judgment stage, the "Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried."  *Anderson*, 477 U.S. at 247-49.

When deciding a motion for summary judgment, "the Court must view the evidence, making all reasonable inferences from the evidence in the light most favorable to the non-moving party."  *Bouriez v. Carnegie Mellon Univ*., 585 F.3d 765, 770 (3d Cir. 2009)).[2]  If there

---

[2] The parties must rely only on admissible evidence to prepare their motion papers.  Indeed, the Defendants have produced as support for their motion a number of emails between non-parties to this litigation (Joe Walsh and James McCusker) as evidence against Mr. Cairns.  Such emails are inadmissible hearsay when offered, as they are here, for the truth of the matter asserted.  The defendants also offer transcribed voice mails of a non-party, Mr. Joe Walsh, left on the company voicemail of James McCusker.  Such statements are clearly hearsay, were not even intended for Mr. Cairns and are evidence of nothing.  Such inadmissible evidence should not be considered by the Court.  Finally, the Defendants offer an expert report of a forensic computer analyst, who was never identified in

is a factual issue that cannot be resolved without a credibility determination, the "Court must credit the non-moving party's evidence over that presented by the moving party." *Anderson*, 477 U.S. at 255).

> **B.      Plaintiff's Claim for Violation of the WPCL Survives Summary Judgment.**

Cairns' Complaint raises a claim for violation of Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 Pa.C.S. § 260.1, *et seq*.  As hibu argues in its motion, the WPCL does not provide an independent right of action, but rather provides a remedy when an employer violates Pennsylvania law and fails to pay its employee in a timely manner. 43 Pa.C.S. § 260.1.

The Complaint alleges that hibu fell derelict in its obligation to pay Cairns severance in accordance with his employment agreement.

Under the WPCL, 43 Pa.C.S. § 260.3 (b),

> [e]very employer who…agrees to pay or provide fringe
> benefits or wage supplements, must. . . pay or provide the fringe
> benefits or wage supplements, as required, within 10 days after
> such payments are required. . .within 10 days after such payments
> are required to be made directly to the employe, or within 60 days
> of the date when proper claim was filed by the employe in situations
> where no required time for payment is specified.

The Defendants argue that Cairns is not entitled to the severance pay he claims because Cairns did not have an employment contract guaranteeing him any severance. They argue that to prevail on a claim arising under the WPCL, Cairns must prove there was a *written* agreement for severance.  But, then, the Defendants also note, more accurately, that all that is required is that Cairns demonstrate that he had a contractual right to the compensation.  This, as it must, leaves room for the contract to arise orally, or by implication.

---

discovery and whose report was not provided and no opportunity to depose or offer a rebuttal report was provided. These exhibits should not be considered in support of the Defendants' motion for summary judgment.  But, even if they are, they do not form a basis on which to grant summary judgment, in any event.

The record evidence demonstrates that there was a policy, pattern and practice at hibu to pay reasonable severance to terminated employees. (Exhibit A, Cairns Dep. Tr., 153:13-159:23; Exhibit D, Wells Dep. Tr., ; Exhibit F, Bates Dep. Tr. ).  But, even if the Court is unpersuaded by the admissions made by Wells and Bates in the cited testimony, Cairns asserts that he did have a written contract, but that it was contained within his office.  (Exhibit A. Cairns Dep. Tr., 147:20-159:23, 289:19-292:4). When Cairrns was terminated, he was at home sick and the termination was effective while he was out of the office sick.  Accordingly, he was not on the premises to collect his things and was at the mercy of hibu to return the contents of his office.  Indeed, Cairns kept numerous important personal documents in his office, including his employment agreement, none of these documents was returned to him. Cairns requested a copy of his employment contracts in discovery.  The Defendants have not confirmed that it does not exist.  Further, they have not addressed what became of the contents of Cairns' office, to include his personal effects and documents.  This failure to produce, particularly under the circumstances that Mr. Cairns was never permitted to return to his office to collect his own belongings and papers, should be construed against hibu since hibu alone has controlled all access to the contents of Cairns' office since before March 6, 2013.  (Exhibit A. Cairns Dep. Tr., 147:20-159:23, 289:19-292:4).

Furthermore, Mr. Wells, hibu's counsel, confirmed at his deposition that Cairns is entitled to severance on the same terms as Mr. McCusker. (Exhibit D, Dep. Tr. Wells, 52:2-56:10).  Wells, an attorney, has not disputed the legal obligation to pay severance.  Accordingly, the Defendants admit that they have unlawfully withheld wages from Cairns in violation of WPCL.  Therefore, the Defendants are not entitled to summary judgment on Cairns' claim arising out of an alleged violation of WPCL.  The motion must be denied.

C.     Plaintiff's Claim for Defamation Survives Summary Judgment.

To set forth a claim for defamation in Pennsylvania, Cairns must establish: "(i) the communication was defamatory; (ii) it was published by the defendant; (iii) the communication applies to the plaintiff; (iv) the recipient of the communication understands the communication's defamatory meaning; (v) the recipient understands the communication to be intended to apply to the plaintiff; (vi) special harm resulting to the plaintiff from its publication; and (vii) abuse of a conditionally privileged occasion."  42 Pa. C.S. § 8343(a); see also *Fanelle v. LoJack Corp.,* 79 F. Supp. 2d 558, 561-62 (E.D. Pa. 2000).

Under Pennsylvania law, a statement is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.  *Devon Robotics v. Deviedma,* 2009 U.S. Dist. LEXIS 112077, 24-25 (E.D. Pa. Nov. 30, 2009)(applying Pa. law).  The touchstone in determining whether a statement is capable of defamatory meaning is how the statement would be interpreted by the average person to whom it was directed. *Regis Ins. Co. v. A.M. Best Co.,* 2013 U.S. Dist. LEXIS 28006 (E.D. Pa. Mar. 1, 2013).  The plaintiff need not prove special harm for statements that constitute defamation per se.  Defamation per se includes publications that "impute to another conduct, characteristics, or a condition that would adversely affect his or her lawful business trade."  *Bakare  v. Pinnacle Health Hosp., Inc.,* 469 F. Supp. 2d 272, 298 (M.D. Pa. 2006)(citations omitted). When opinion speech discloses untrue statements of fact, it is no longer absolutely protected.  See, e.g., *Mzamane v. Winfrey,* 693 F. Supp.2d 442, 481-83 (E.D. Pa. 2010).

The allegation here is that, at a minimum, the statements made about Cairns in the email circulated to all of hibu's US employees following his termination are defamatory by innuendo. It is, as a preliminary matter, for the court to determine whether the statement is capable of a

defamatory meaning.  In making a determination whether the statement is capable of defamatory meaning, the Court must consider the nature of the audience.  See, *e.g., Agriss v. Roadway Express, Inc.*, 483 A.2d 456 (Pa. Super. 1984)(finding that the audience for the defamatory statement made it clear that plaintiff would be subject to contempt and ridicule).  The ultimate question is whether the alleged defamatory statement will have a tendency to lower the plaintiff's esteem in the community. It is for the Court to determine as a matter of law whether statements are capable of defamatory meaning.  *Mzamane*, 693 F. Supp. 2d at 481 (citations omitted); *Tucker v. Phila. Daily News*, 848 A.2d 113, 123 (Pa. 2004).

So long as a statement is capable of defamatory meaning, it is for the jury to decide whether the statement is in fact defamatory.  *Brophy v. Phila. Newspapers, Inc.*, 422 A.2d 625, 628 (Pa. Super. Ct. 1980).  In other words, once it has been determined that as a matter of law a statement is capable of defamatory meaning, a jury must then determine whether that statement is defamatory as a matter of fact.  Only a fact-finder can determine whether a statement is actually defamatory. As an extension of that, when the issue is whether the statement is defamatory by innuendo or implication, only the jury is able to determine whether a substantially true statement is nonetheless defamatory.  A plaintiff is defamed by innuendo when "the words utilized themselves are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, i.e., defamation by innuendo." *Mzamane,* 693 F. Supp.2d at 477; see also *Thomas Merton Ctr. v. Rockwell Int'l Corp.,* 497 Pa. 469, 467, 442 A.2d 213, 217 (1981); *Bogash v. Elkins,* 405 Pa. 437, 440, 176 A.2d 677, 679 (1962); *Sarkees v. Warner-West Corp.,* 349 Pa. 365. 567-368, 37 A.2d 544, 546 (1944).

At a minimum, the first four elements must be conceded by the Defendants.  Indeed, their own motion admits that the alleged defamatory statement is contained in an email that was

broadly distributed to all US employees of hibu and that though not named outright, the position held by Cairns was described, and he was the only person who held the position and therefore it would have been known to any person who received the email and read it that it was referring to Mr. Cairns.[3]  Indeed, the Defendants' motion provides argument solely as to the issues of damages, conditional privilege and the defense of truth.  Accordingly, Cairns will address each of those issues in turn and provides no further argument regarding the conceded elements of a defamation claim.

      **1.**    **hibu's defamatory statement about Cairns is not conditionally privileged, but even if it were, such privilege was abused.**

Defendants assert that under the common interest privilege, because the communication was intra-corporate, they are immune from liability for defamation.  But, Defendants overstate and misapply the "common interest" privilege. In any event, even if the common interest privilege might apply, it was abused.

As the Pennsylvania Superior Court observed regarding the common interest privilege in *Miketic v. Baron,* 450 Pa. Super. 91, 101 (Pa. Super. Ct. 1996)(citation omitted):

> Communications made on a proper occasion, from a proper motive, in a proper manner, and based upon reasonable cause are privileged.
>
> "'An occasion is conditionally privileged when the circumstances are such as to lead any one of several persons having a common

---

[3]While this Court did not reach the merits of the claims at the motion to dismiss stage, the companion case to this, *McCusker v. hibu, PLC, et al.,* remains pending in the Eastern District of New York at docket number 2:15-cv-02659.  The Court in that case did reach the merits on the identical defamation claim and has already determined that the email is capable of a defamatory meaning as a matter of law. A true and correct copy of the Court's Memorandum Opinion on the Partial Motion to Dismiss is attached as Exhibit M.  The defendants should be collaterally estopped from raising issues that have already been litigated.  *Stoeckinger v. Presidential Fin. Corp. of Delaware Valley*, 948 A.2d 828, 833-34 (Pa. Super. 2008); *Comment, Collateral Estoppel in Pennsylvania*, 10 Duquesne L. Rev. 650 (1972); and *Restatement of Judgments* § 70 (1942)). Indeed, it has been determined that the language of the email at issue is capable of a defamatory meaning.  At that point, only a jury can determine whether it is in fact defamatory.  *Brophy*, 422 A.2d at 628.

> interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know.'"
>
> Thus, proper occasions giving rise to a conditional privilege exist when (1) some interest of the person who publishes defamatory matter is involved; (2) some interest of the person to whom the matter is published or some other third person is involved; or (3) a recognized interest of the public is involved.

*Id.* (quoting *Daywalt v. Montgomery Hosp.,* 573 A.2d 1116, 1119 (Pa. Super. Ct. 1990). But, a conditional privilege may be lost if the publisher exceeds the scope of his privilege by publishing the defamation to unauthorized parties. *Miketic,* 450 Pa. Super. at 97-98. The Court must determine as a matter of law whether a conditional privilege applies to the speech, but it is only for the jury to determine whether such privilege has been abused. *Id.* It is the Defendants' burden to prove application of privilege. *Moore v. Cobb-Nettleton,* 2005 PA Super 426, P6 (Pa. Super. Ct. 2005).

Here, the Defendants argued that they were privileged to describe Cairns as "disloyal" and suggest that he was terminated for sharing company secrets. The Defendants believe that because Cairns was a high-level executive of hibu, sharing information about his termination falls squarely within the confines of the common interest privilege.

However, accusing Plaintiff of "disloyalty" and threatening legal action would be understood by anyone, including but not limited to the rank and file employees at hibu, as a slur that would lower Plaintiff in the estimation of the community and certainly deter others from wanting to deal with him in business and otherwise. Indeed, giving away company secrets, as the communication implies, can be deemed a crime under the U. S. Espionage Act of 1996, 18 U.S.C. § 1831*, et. seq.*

There was no proper occasion for the inclusion of those accusations in a notice of dismissal or termination-especially to all 3,000 employees of hibu US. This overbroad

publication takes the email outside of the protections of any common interest privilege.  The common interest conditional privilege is abused when the publication includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose. *Byrd v. Sacco,* 2006 Phila. Ct. Com. Pl. LEXIS 291 (Pa. C.P. 2006). While perhaps a notification of termination was reasonably necessary to explain Cairns' departure from hibu, there was no reason to include trumped up charges of disloyalty and a suggestion of further legal action other than to defame him.

It was not necessary to any common interest that the email be disseminated to all employees in hibu's US business. While supervisors, maybe even board members, might have had a legitimate reason to know that Cairns had been accused of disloyalty (assuming, *arguendo*, that they were true, which they were not), not every one of the 3,000 or so employees at hibu needed to possess this information.  Thus, any privilege that might have applied here has been abused. See, *e,g*., *Sias v. General Motors Corp.,* 372 Mich. 542, 548 (Mich. 1964)(declining to extend the privilege beyond disclosures to supervisory ranks).  Accordingly, to the extent the Court finds that the statements in the email might be conditionally privileged, the jury must resolve whether such privilege was abused.  There is ample evidence from which the jury could determine that rank and file employees, who would not have had any direct contact with Cairns needed to be made aware of Cairns' termination or the false and defamatory reasons for it. Indeed, the jury could easily find that the email was circulated to scapegoat Cairns, malign a beloved senior executive and to instill a culture of fear to deter other employees from acting in the best interest of hibu instead of hewing the cry of Pocock and his poorly hatched plan that did nothing to bolster hibu's growth.

Therefore, as a jury must resolve this genuine issue of material fact, the Defendants' are not entitled to summary judgment on the issue of application of a privilege to speak otherwise defamatory words about Cairns.

**2.    The defamatory statements made about Cairns in the email are defamatory per se; therefore proof of damages is not required and damages are presumed.**

The defendants argue that Cairns' defamation claim must fail because he cannot establish that he suffered any harm as a result of having been defamed.  This argument flies in the face of both the law of defamation in Pennsylvania as well as the record evidence. Indeed, there is ample evidence from which a jury could reasonably conclude that Cairns was harmed.  Indeed, the plaintiff need not prove special harm for statements that constitute defamation per se. Defamation per se includes publications that "impute to another conduct, characteristics, or a condition that would adversely affect his or her lawful business trade."  *Bakare  v. Pinnacle Health Hosp., Inc.,* 469 F. Supp. 2d 272, 298 (M.D. Pa. 2006)(citations omitted); see also, *Paul v. Davis,* 424 U.S. 693 (1976) (in dismissing a claim under § 1983, the United States Supreme Court determined that a defamation action would have withstood scrutiny, because in such a case, damages are presumed).  The defamatory statement at issue, *inter alia,* accuses Cairns of disloyalty.  There is no interpretation of this statement that puts it outside of the defamation per se context.  There can be no worse accusation of a high-level corporate executive than to suggest that he is a person who acts against company interest and shares company secrets.  Accordingly, Cairns' damages must be evaluated under the law of defamation per se.  Even though damages are to be presumed, and need not be proved, Cairns' damages are not limited to general damages. Indeed, he has also suffered special damages.

While special damages are not a requirement for proof of Cairns' defamation claim, the record evidence establishes that he did, in fact, suffer pecuniary harm as a result of having been

defamed.  Special harm is economic loss.  *Beverly Enterprises, Inc. v. Trump,* 182 F.3d 183, 188

(3d Cir. 1999).  The Defendants argue that Cairns cannot demonstrate any actual loss because he

obtained replacement employment "within a month" of his termination from hibu.  Defts.'

Memorandum at p. 17.  But, Cairns worked as an unpaid consultant for Access Holdings

immediately after his termination.  In connection with that work, he was reimbursed for out of

pocket business expenses, such as travel, but he was not paid a salary or otherwise compensated

for the work he performed.  (Exhibit A, Dep. Tr. Cairns, 105:18-108:23).  Cairns did not get a

paid position until he was hired at Dex Media, Inc. in October 2014, over a year a half after

having been defamed by hibu.

      The Defendants argue that because Cairns was ultimately hired within the industry and

by a direct competitor company, he could not have been defamed.  This ignores the difficulty

Cairns had obtaining a new job and the friends and contacts he has lost since he was defamed.

(Exhibit A. Dep. Tr. Cairns, 51:2-58:1).  But, only a jury can determine whether and to what

extent the defamation had an impact on the length of time it took for Cairns to get a new paid job

after he was terminated and defamed by hibu.  The Defendants have asked the Court to make an

inference in their favor, when all inferences must be drawn in favor of Cairns on a motion for

summary judgment.

      But, the defamatory statements made about Cairns are defamatory *per se*.  So, proof of

actual loss is not required.  *Bakare,* 469 F. Supp. 2d at 298.  In such a case, actual damage to

reputation are to be presumed.  *Id.* Indeed, the Pennsylvania Standard Civil Jury Instructions,

17.180B, make clear that where the jury finds the defendant made the false and defamatory

statements with actual malice,[4] the jury is to presume that the plaintiff's reputation was in fact harmed and award damages accordingly.  SSJI (civ) § 17.180B.

In the context of a defamation claim, actual malice means knowledge that a published statement is false or that the speaker acted with reckless disregard for the truth or falsity of the statement it published.  *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964); see also *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1089 (3d Cir. 1985).   Reckless conduct "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing."  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).  Rather, to demonstrate reckless disregard for the truth or falsity of a defamatory statement, the plaintiff must show "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of its publication."  *Id*.  This is a subjective inquiry that may be based on circumstantial evidence that demonstrates sufficient evidence to show that the defendant had a high degree of awareness of probable falsity.  *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989)(citations omitted).  It is rare in a defamation case to find direct evidence of a defendant's "serious doubts" as to the truth of a published defamatory statement.  *St. Amant v. Thompson,* 390 U.S. at 732.

Here, actual malice is established by the deposition testimony of Wells and Green, who each made clear that no investigation of Mr. Cairns' alleged conduct revealed any evidence of corporate disloyalty. (Exhibit E, Dep. Tr. Green, 97:4-99:6).  Accordingly, there was no factual predicate (nor could there be) for making accusations of corporate disloyalty.

But, even if a proper investigation had been undertaken, the statements would still be defamatory because they are false and accuse Cairns of dishonesty in the way he conducts

---

[4] Here, there is a discussion of actual malice because that is the standard required for the presumption of damages to attach.  This is not to be read as an admission that Cairns is a public figure, which he is not.

business—tantamount to corporate espionage.  Indeed, hibu would not have been able to find evidence to substantiate these accusations because none exists—Mr. Cairns was never disloyal to hibu.  Nonetheless, the failure to conduct an investigation and follow company termination protocols is evidence of reckless disregard for the truth—or even knowledge here—the email claims a "thorough investigation" revealed wrongdoing, when investigation protocols were not followed.  (Exhibit B).  Mr. Pocock had to have known that the investigation did not take place and that he did not have the Board's approval for his actions.  Accordingly, from this evidence, it is clear that even on the higher actual malice standard, Cairns claim survives summary judgment. Damage to his reputation must be presumed.  Therefore, the motion for summary judgment must be denied as to a failure to establish damages.

> **3.    There is a genuine issue of material fact regarding the truth of any statement contained in the email; therefore a jury must decide whether any part of the statement is true.**

The Defendants argue they are entitled to summary judgment because they have demonstrated that the statements made in the email are true.   As the Defendants' motion states, truth is an absolute defense to a claim for defamation, but the burden of proof is on the Defendant to prove the truth of the statements.  *Fanelle,* 79 F. Supp. 2d at 562.  Certainly, the jury will have to evaluate whether and to what extent any "investigation" of Cairns' alleged disloyalty was "thorough."

Here, even the internal team allegedly responsible for participating in the "investigation" and making the determination whether to discipline or, in this case, discharge Cairns for alleged disloyalty, does not tell a consistent story regarding the nature and extent of the investigation, or even when the investigation took place.  Indeed, there is some testimony that the investigation took place *after* the decision was already made to terminate Cairns' employment.  If this testimony is believed by the jury, then it follows that is untrue that a "thorough investigation"

19

informed the decision to terminate Cairns, as was stated in the company-wide email. Accordingly, a reasonable juror could easily conclude that the statements made in the email were not true at all, let alone substantially true.  As this material question of fact is in dispute, summary judgment cannot be granted on the basis of the defense of undisputed truth.

The defendants also argue that Cairns does not dispute that he was critical of Pocock. But, Cairns was under no  duty or obligation to like Pocock or to support Pocock's initiatives, to the extent that Pocock's plans were not otherwise in the best interest of hibu.  Indeed, Cairns' loyalty ran to the company and not to Pocock.  There is a legal distinction between the two.

The Court may be persuaded by a recent decision out of the Delaware Chancery Court regarding the duty of loyalty owed by an executive to the company vis. the company's senior leadership.  *OptimisCorp. v. Waite*, 2015 Del. Ch. LEXIS 222, at 204-216 (Del. Ch. Ct. Apr. 30, 2015).  Among the many claims the court addressed in *Waite,* was a breach of loyalty action against the defendants (two directors, the CFO and the COO) for sabotaging the Company's strategic plan.

 The company, Optimus, had been working on two sets of software for the market, the OptimisPT and the Optimus Sport.  The CEO believed that the Optimus Sport software was the path to favor with company resources, while the defendants challenged that position, believing instead that the company should allocate its resources to perfecting the OptimisPT.  In findings after trial, the *Waite* court held that the sabotage claim was not proven, and that the defendants' alleged challenge of the CEO's authority and his desired allocation of assets did not constitute a breach of the duty of loyalty.  The court held that the position of the defendants was not adopted to elevate their personal interests or any self-interested transactions over the interests of the company; rather, their position was a reasonable one, taken in the belief it would further the

company's interests.  (*See Id*. at 207-209).  The defendants' duty of loyalty extended to the

company, not to its CEO:

> Plaintiffs attempt to turn this competition, which manifested itself
> in a difference of opinion between Morelli [the CEO] and the
> Director Defendants, into a breach of the duty of loyalty.  The
> actions complained of do not amount to such a breach. . . .
> Plaintiffs further contend that "Defendants repeatedly challenged
> Morelli's authority and allocation of assets within the Company,
> all outside of Morelli's presence.  *The duty of loyalty is owed to the
> corporation and the stockholders at large, not to Morelli. The duty
> of loyalty did not require Defendants to act like lemmings with
> respect to Morelli.*  The evidence may show that Defendants did
> not like Morelli, but Plaintiffs have not proven that Defendants
> "undermined" his authorit*y such that they acted disloyally to
> Optimis*
>
> . . . .

(emphasis added).  Id. at 209-10) (emphasis added).  This notion that Cairns should put the plans

of Pocock above the interests of the company is incompatible with the duty of loyalty.

As Cairns testified in his deposition, Pocock put forth a plan to generate revenue to the

company in the billions of dollars.  When all was said and done, the only revenue at all coming

from the US digital business was from projects that pre-existed Pocock and that were put in place

by company employees, including but not limited to Cairns.  None of Pocock's plans came to

fruition—even after Cairns' termination.  Nonetheless, Pocock took full credit for Cairns' work

and attributed these revenues to his own efforts.  Cairns disagreed with Pocock's plans because

his years of experience in the field of digital marketing told him that Pocock's plans would fail

and would not be of any benefit to hibu or its stakeholders.  (Exhibit A, Dep. Tr. Cairns, 38:20-

39:3; 187:4-189:7; 222:16-224:8).

The Defendants' argument that Cairns disclosed sensitive information to Joe Walsh for

his own benefit and to the detriment of hibu raises further questions of fact to be determined by a

jury.  Indeed, it is undisputed that Joe Walsh made at least two attempts to purchase hibu.  The

21

second bid, which was somewhat contemporaneous with Cairns' termination, was made at the request of CoCom.  Exhibit L.  Indeed, participants in CoCom were feeding information to Walsh in an effort to entice him into making a bid.  Exhibit K. There is no evidence at all that Cairns provided any information to Walsh.  The hibu witnesses have even admitted that at deposition.  (Exhibit D, Dep. Tr. Wells, 182:4-183-5, Exhibit E, Exhibit C, Dep. Tr. Pocock, 108:12-24, Exhibit F, Dep. Tr. Tony Bates, 61:21-62:2; Exhibit G, Chris Wilmot 12:15-20, 24:5-17; Exhibit H, Richard Hooper, 31:23-33:21; Exhibit I, Bryan Turner, 87:20-88:24).

Undoubtedly, in the face of this testimony, a reasonable jury could conclude that Cairns did not breach his duty of corporate loyalty.  This makes the statement regarding his disloyalty patently false.

A jury will have to assess this testimony in light of the law applicable to the duty of loyalty to determine whether it is accurate to accuse Cairns of disloyalty, when all evidence points to the contrary.  Indeed, Cairns was a very loyal employee of hibu and its predecessor companies for nearly 30 years.  The evidence demonstrates that Cairns was terminated and maligned for being loyal to the company at the peril of his employment.  Again, there are genuine issues of material fact established by the record, which must be resolved by the jury. Therefore, summary judgment should not be granted.

## III.    CONCLUSION

For all the reasons stated in this memorandum of law, each claim asserted by Plaintiff Mark Cairns survives the Defendants' motion for summary judgment.  Indeed there are

numerous genuine issues of material fact raised by the record which must be resolved by a jury.

Accordingly, the Defendants' motion for summary judgment must be denied.

Respectfully submitted:

**HAINES & ASSOCIATES**

*/s/ Clifford E. Haines*
CLIFFORD E. HAINES
DANIELLE M. WEISS
The Widener Building, 5th Floor
1339 Chestnut Street
Philadelphia, PA 19107
*Attorneys for Plaintiff*

Dated: April 25, 2016

23

**CERTIFICATE OF SERVICE**

I, Clifford E. Haines, Esquire, hereby certify that a true and correct copy of the foregoing *Plaintiff's Memorandum Response in Opposition to Defendants' Motion for Summary Judgment* was served via the Court's Electronic Filing System and via E-Mail upon all counsel of record as follows:

Bret A. Cohen, Esquire
Gauri P. Punjabi, Esquire
Mintz, Levin, Cohen, Ferris,
Glovsky & Popeo, PC
One Financial Center
Boston, MA  02111

William M. McSwain, Esquire
David J. Woolf, Esquire
Dennis M. Mulgrew, Jr., Esquire
Drinker Biddle & Reath, LLP
One Logan Square
Suite 2000
Philadelphia, PA  19103-6996

Dated: April 25, 2016            __/s/ Clifford E. Haines_____
                                                CLIFFORD E. HAINES