IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARK CAIRNS,** | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| v. | : | No. 2:14-cv-05671 |
| **HIBU PLC,** *et al.* | : | |
| Defendants. | : | |

**DEFENDANTS HIBU INC., HIBU PLC AND MICHAEL POCOCK'S
PRETRIAL MEMORANDUM**

Defendants hibu, Inc., hibu plc and Michael Pocock (together, "Defendants") hereby submit their Local Rule 16.1(c) Pretrial Memorandum, and state as follows:

**I.  BRIEF STATEMENT OF NATURE OF THE ACTION AND THE BASIS ON WHICH JURISDICTION OF THE COURT IS INVOKED**

Plaintiff Mark Cairns ("Plaintiff") brings claims of defamation and violation of the Pennsylvania Wage Payment and Collection Law ("WPCL") against Defendants. This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and Plaintiff claims an amount in controversy that exceeds $75,000.

**II.  THE DEFENDANTS' STATEMENT OF FACTS**

**A.  Factual Summary.**

Defendants terminated Plaintiff's employment after an investigation revealed that Plaintiff sought to undermine hibu's senior leadership team by, among other things, providing assistance to a third party seeking to purchase hibu's U.S. business. Plaintiff asserts a breach of the WPCL for alleged unpaid severance and a claim of defamation, which is solely based upon

an internal email sent by Defendants to hibu employees stating that Plaintiff and another employee were terminated for conduct that hibu considered to be disloyal. Plaintiff cannot establish either of his claims.

With regard to his WPCL claim, Plaintiff cannot point to any enforceable contractual agreement to pay him severance. Instead, as alleged in his Complaint, Plaintiff relies on an alleged "policy, pattern, and practice" at hibu to pay severance to terminated employees. There is no evidence, however, that hibu had such a policy of paying severance to *all* terminated employees. Rather, Plaintiff testified only that he is aware of hibu making some discretionary severance payments to certain employees who were let go as part of a reduction in force, a situation not akin to Plaintiff's termination for suspected misconduct. Furthermore, Plaintiff admitted that severance would, in any event, required the terminated employee's execution of a release of claims, which Plaintiff did not sign. Therefore, Plaintiff cannot establish that this alleged "policy of severance" rises to the level of an enforceable contract, as required by the WPCL.

Alternatively, Plaintiff alleged in his opposition to Defendants' Motion for Summary Judgment for the first time that a written employment contract entitling him to severance exists. Plaintiff offers no evidence that this contract exists and hibu confirmed to Plaintiff that no such contract exists. Most telling, Plaintiff's self-serving allegation is directly contrary to the averments of Plaintiff's Complaint, wherein he admitted that he has no written agreement entitling him to severance and explicitly acknowledged that his WPCL claim was based on the alleged "policy, pattern and practice" described above. (*See Compl.* ¶¶ 80-81 ("Mr. Cairns was not a party to a formal, written employment contract with hibu Inc. hibu Inc. did, however, have an established policy, pattern and practice of providing relatively uniform, severance benefits to

executives without employment contracts."))  Accordingly, whether his claim is based upon the alleged "policy, pattern and practice" or the alleged written contract, Plaintiff cannot establish his claim under the WPCL.

With regard to his defamation claim, Plaintiff cannot establish that the alleged defamatory statements in the internal email were untrue.  Plaintiff admitted that, while employed by hibu, he spoke about hibu business to a third party who was interested in purchasing hibu, felt that he owed no loyalty to hibu's leadership during a period of financial instability, criticized the leadership team, and tried to organize employees against hibu management.

He also cannot establish his *prima facie* case because he has no evidence showing that he suffered any harm as a result of the internal email which notified hibu employees that his employment had been terminated after a "thorough investigation" into conduct that the Company "considered to be disloyal and against the interests of its employees and other stakeholders." Plaintiff cannot identify any job opportunities that he lost as a result of the email.  Moreover, he is now employed by one of hibu's main competitors and is earning more and working less than he did at hibu.  He also cannot point to any facts demonstrating that he suffered any reputational harm or personal humiliation.

Furthermore, Plaintiff cannot show that Defendants abused their conditional privilege in making the alleged defamatory statements.  Plaintiff undermined hibu's executive leadership during a time when hibu was on the brink of insolvency and attempting to restructure its debts. Defendants, therefore, had a legitimate need to communicate that it needed its employees to be loyal to the leadership's plan and strategy at this critical juncture.

    **B.**    **Background on the Parties.**

hibu Inc. is a print and digital media business located in King of Prussia, Pennsylvania.

hibu plc was the parent company of hibu Inc. until late 2013, when it entered administration, a procedure akin to bankruptcy pursuant to the law of the United Kingdom.  On January 23, 2016, a U.K. court dissolved hibu plc and as a result, no assets of that entity remain.

In February 1984, Plaintiff began working for hibu in the United Kingdom.  While working in the United Kingdom, Plaintiff did not execute any contract that provided for any severance pay.  In January 2006, Plaintiff began working for hibu in the United States.  hibu employed Plaintiff as an at-will employee and did not enter into any employment contract with Plaintiff requiring the payment of severance.  hibu did not have a policy of providing severance to all terminated employees.

In 2011, Plaintiff became the Head of US/UK Operations for hibu, a position he held until hibu terminated his employment.

        **C.**        **hibu Encounters Serious Financial Difficulty.**

As a result of the declining demand for print media, hibu plc began facing financial difficulties.  In 2009, hibu refinanced its business.  In 2011, hibu appointed Defendant Mike Pocock as the group Chief Executive Officer and tasked him and his senior leadership team with restructuring the business and formulating a new business strategy to help hibu survive.  Mr. Pocock and his team instituted a series of changes, including a new digital strategy.

A coordinating committee of lenders ("CoCom") was created to negotiate the repayment of the debt to hibu's 300 lenders.  All significant strategic business decisions undertaken by Mr. Pocock and his team thereafter were disclosed to CoCom and CoCom's advisors.  Included among the items disclosed to CoCom was an aggressive four-year projected revenue forecast for hibu.

Mr. Pocock and his leadership team held quarterly town hall meetings during which they would discuss the current state of hibu and invited employees to raise any questions at that time. If an employee did not feel comfortable voicing their concerns or questions about hibu's business strategy to Mr. Pocock and his team during a town hall meeting, the employee could alternatively utilize hibu's anonymous "Speak Up" hotline.

**D.      Plaintiff Aligns with an Ex-hibu Employee to Undermine hibu's Leadership.**

Prior to his discharge, Plaintiff came to disagree with Mr. Pocock's turnaround efforts and, by his own admissions, began to engage in conduct that was disloyal to those efforts. Rather than using any of the channels described above to voice his concerns, Plaintiff actively discussed hibu's business with Joe Walsh, hibu Inc.'s former Chief Executive Officer whose employment Mr. Pocock terminated in 2012. Both during and after his employment with hibu, Mr. Walsh tendered two offers to purchase hibu's U.S. business. Despite the rejection of both his offers, Mr. Walsh remained interested in purchasing hibu's U.S. business up through Plaintiff's termination.

Mr. Walsh was, in fact, active during this time period in reaching out to many of hibu's U.S. leadership team. From January 30, 2012 through February 28, 2013, there were nearly 300 telephone calls and text messages made between Mr. Walsh and various hibu U.S. executives. Several of these phone calls and text messages took place while the hibu U.S. executives were attending confidential business strategy meetings. Following these communications, Mr. Walsh revealed his knowledge of confidential hibu information that had not yet been disclosed to the public.

Plaintiff was aware of Mr. Walsh's interest in purchasing hibu's U.S. business, but nevertheless spoke to him about the Company and its leadership. During the sensitive period

while Mr. Pocock and his team were working with CoCom in repaying hibu's debt, Plaintiff remained in close contact with Mr. Walsh, speaking with him on his hibu work phone 23 times. Mr. Walsh sent Plaintiff an email regarding Platinum Equity, the entity with whom Mr. Walsh submitted his first offer to purchase hibu's U.S. business, and told him that he was "terrific." Plaintiff also spent a weekend at Mr. Walsh's home in Maryland in the weeks before Mr. Walsh tendered his second bid to purchase hibu's U.S. business.

On February 28, 2013, at 12:35pm EST, Mr. Walsh called Plaintiff after speaking with an advisor to CoCom and left a voicemail. In the voicemail, Mr. Walsh said that he had "managed to connect with the guys in the UK." Mr. Walsh thereafter sent Plaintiff an email at 12:38pm EST asking Plaintiff to call him. Upon seeing the email, Plaintiff immediately deleted Mr. Walsh's email both from his Inbox and his Deleted Items folder, even though it was not his standard practice to do so. Plaintiff then called Mr. Walsh at 1:03pm EST and spoke with him for 13 minutes. Less than 1.5 hours later, a secure delete tool was run on Plaintiff's hibu-issued computer that permanently deleted files off of the computer.

Along with James McCusker, hibu Inc.'s President, Plaintiff provided substantial assistance to Mr. Walsh's efforts to purchase hibu's U.S. business. As part of the campaign, Mr. Walsh directed Mr. McCusker to "put together a list of all the CoCom member contact details" and "get as many of our leaders" to say that they "can't work another day for Mike Pocock." The goal of the campaign was to have hibu employees "maul [CoCom]" and "deluge the switchboard" with complaints about Mr. Pocock. Plaintiff possessed such a contact list. Plaintiff also participated in a conference call with Mr. Walsh and Mr. McCusker on December 4, 2012 when he and Mr. McCusker were participating in week-long strategy and business review meetings.

In further effort to aid Mr. Walsh's attempt purchase hibu's U.S. business, Plaintiff also became a vocal critic of Mr. Pocock internally among hibu employees. Among other things, Plaintiff led meetings to put pressure on hibu employees to rally against Mr. Pocock. He also harshly criticized leadership's decisions in emails with fellow employees. For example, during a meeting at which Mr. Pocock and his leadership team were speaking, Plaintiff told Mr. McCusker that the meeting was "a bloody waste of time as always!" During the week-long strategy and business review meetings that took place the week of December 3, 2012, Plaintiff told Mr. McCusker that hibu's leadership was "much more interested in talking amongst themselves."

To further assist Mr. Walsh's efforts, Plaintiff worked to delay implementation of the global strategy, by missing key deliverables and maintaining a negative attitude during group meetings.

### E.     hibu's Investigation Reveals Plaintiff's Disloyal Conduct and Results in Plaintiff's Termination.

Defendants were unaware of Plaintiff's disloyal actions until an anonymous source informed them that Mr. Walsh sought to purchase hibu's U.S. business once again and that Plaintiff and Mr. McCusker were assisting Mr. Walsh's efforts by trying to rally employees against Mr. Pocock and his leadership team. The anonymous source further informed Defendants that Mr. Walsh was circulating "a spreadsheet containing the names and contact details of the CoCom members" with "[t]he aim [] to persuade CoCom that Joe [Walsh]'s bid is their best option." Plaintiff possesses numerous copies of this spreadsheet, but has no explanation for why he has them or from where he obtained them.

After receiving this information, Defendants commenced an investigation of Plaintiff's and Mr. McCusker's conduct, which uncovered the emails, phone calls, and voicemails between

7

Plaintiff, Mr. McCusker and Mr. Walsh.  Based on the investigation, Defendants concluded that Plaintiff and Mr. McCusker had engaged in disloyal conduct, were actively undermining Mr. Pocock's efforts, and were working instead to help Mr. Walsh buy the Company.  Defendants nevertheless decided to give Plaintiff and Mr. McCusker the opportunity to explain their actions.

On March 6, 2013, Christian Wells, hibu Group General Counsel and Company Secretary, and Malcolm Green, hibu's Global Head of Compliance & Group Internal Audit, asked Plaintiff about his communications with Mr. Walsh.  Plaintiff refused to go through his communications with Mr. Walsh and did not provide credible explanations for his phone and email activity concerning Mr. Walsh.  As a result, Defendants terminated Plaintiff's employment after the interview.  Defendants also terminated Mr. McCusker's employment based on his interview.

### F. Defendants Send an Email Communication to Employees About Plaintiff's Termination.

Because Plaintiff and Mr. McCusker were senior executives who were known among thousands of hibu's employees, on March 6, 2013 Mr. Pocock sent an email to hibu's U.S. employees notifying them of the termination of Plaintiff's and Mr. McCusker's employment (the "Email").  The Email, which forms the sole basis of Plaintiff's defamation claim, states in relevant part:

> I am writing to notify you of two changes in our Senior Management Team (SMT) which have immediate effect. Jim McCusker and Mark Cairns have been dismissed today following a thorough investigation into conduct by them that the Company considered to be disloyal and against the interests of its employees and other stakeholders.

Plaintiff claims that Defendants' statements in the Email that he was discharged after a "thorough investigation" for conduct the Company "considered to be disloyal" and "against the interests of its employees and other stakeholders" were false and defamed him.  Plaintiff,

8

however, cannot as an initial matter demonstrate that the statements in the email were untrue. Plaintiff, in fact, boasted that he was not loyal to hibu's leadership; admits that he was not supportive of the leadership's initiatives; admits that he was a vocal critic of Mr. Pocock; does not deny sending disparaging emails about hibu leadership; and has not offered evidence to rebut the core facts uncovered by hibu's investigation and which lead to Plaintiff's termination – *i.e.*, his substantial contact with Mr. Walsh, a third-party who at the time was himself attempting to undermine hibu's leadership team in order to facilitate his purchase of the Company.

Plaintiff also cannot present any evidence that the alleged defamatory statements caused him any reputational harm or economic loss, or otherwise injured his career prospects. Plaintiff cannot identify a single person who thought less of him or ceased to respect him as a result of the Email. Moreover, Plaintiff is unaware of any job opportunities he lost as a result of the Email. Plaintiff did not work immediately after his termination due to preexisting health issues that were unrelated to his work or termination. When his health improved, he found new employment. Since September 2014, Plaintiff works in a lucrative position as the EVP Integration Client Experience at Dex Media, Inc., one of hibu's main competitors. At Dex Media, Plaintiff works three days a week from home and earns $212,000 year in base salary with the potential to earn an additional $127,200 in bonus each year – which, when converted to a full-time basis, is more than Plaintiff was earning at hibu at the time of his termination.

### III. LIST OF EVERY ITEM OF MONETARY DAMAGES CLAIMED

Defendants do not have a claim of monetary damages against Plaintiff.

### IV. THE DEFENDANTS' WITNESS LIST

Subject to the reservation of rights stated therein, the Defendants' trial witness list is attached hereto as Exhibit A. The listing of witnesses does not represent a certification of their availability or control by the Defendants.

V. **THE DEFENDANTS' EXHIBIT LIST**

Subject to the reservation of rights stated therein, the Defendants' list of trial exhibits is attached hereto as Exhibit B. In identifying documents, the Defendants do not admit that all or part of any document is admissible at trial, or may be used in any way.

VI. **ESTIMATED NUMBER OF DAYS REQUIRED FOR TRIAL**

The Defendants anticipate that they can present their defenses in 4-6 full-length days.

VII. **SPECIAL COMMENTS REGARDING LEGAL ISSUES, STIPULATIONS, AMENDMENTS OF PLEADINGS, OR OTHER APPROPRIATE MATTERS**

Defendants believe that this matter is ripe for summary judgment based on the undisputed facts in the record. Accordingly, Defendants filed a Motion for Summary Judgment on both Plaintiff's WPCL claim and defamation claim. The Motion remains pending.

If the Court denies Defendants' Motion, Defendants request the Court order, within ten (10) days of the issuance of such denial, Plaintiff to (1) serve the discovery ordered by the Court in its April 8, 2016 Order, and (2) serve written responses, documents, and a privilege log responsive to hibu Inc.'s Second Set of Requests for Production of Documents and Second Set of Interrogatories, which were due on March 30, 2016. This discovery remains outstanding. If the Court orders this matter to proceed to trial, Defendants will require this information and documents to adequately prepare for trial.

Additionally, the parties agreed that discovery conducted in the action titled *James McCusker v. hibu plc, et al.*, 2:15-cv-2659, pending in the United States District Court for the Eastern District of New York (the "McCusker Action"), may be used in the instant action, and vice versa, and that witnesses may only be deposed once for purposes of both cases. The Court in the McCusker Action approved this agreement during the January 12, 2016 Initial Conference. Defendants request that this Court also approve the agreement between the parties and allow discovery from the McCusker Action to be used in the instant action, and vice versa.

Defendants also note for the Court that many of the witnesses in the instant action live overseas in the United Kingdom and are no longer employed by, or otherwise affiliated with, hibu.  Accordingly, Defendants respectfully request that the Court take into consideration the inconvenience for these third party witnesses to travel to the United States for trial and specifically request that the Court (1) set the trial across consecutive dates, and (2) set the trial as far into the Court's calendar as possible within reason, to minimize the inconvenience to these individuals and give them ample time to plan for and attend trial.

Dated:  June 13, 2016

        Respectfully submitted,

    /s/ Bret A. Cohen
Bret A. Cohen (admitted *pro hac vice*)
Gauri P. Punjabi (admitted *pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA  02111
Telephone: (617) 542-6000
bacohen@mintz.com
gppunjabi@mintz.com

William M. McSwain
David J. Woolf
Dennis M. Mulgrew, Jr.
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA  19103-6996
Telephone: (215) 988-2700
William.McSwain@dbr.com
David.Woolf@dbr.com
Dennis.Mulgrew@dbr.com

*Attorneys for Defendants*