IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK CAIRNS, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | NO.  2:14-CV-05671 |
| | : | |
| HIBU PLC, *et al.*, | : | |
| | : | |
| | : | |
| Defendants. | : | |

_____

### TRIAL BRIEF OF DEFENDANTS HIBU PLC, HIBU INC.
### AND MICHAEL POCOCK
_____

<u>On the Brief:</u>

Bret A. Cohen (admitted pro hac vice)
Gauri P. Punjabi (admitted pro hac vice)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA  02111
Telephone: (617) 542-6000
bacohen@mintz.com
gppunjabi@mintz.com

William M. McSwain
David J. Woolf
Dennis M. Mulgrew, Jr.
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA  19103-6996
Telephone: (215) 988-2700
William.McSwain@dbr.com
David.Woolf@dbr.com
Dennis.Mulgrew@dbr.com

*Attorneys for Defendants*

86243284.7

## TABLE OF AUTHORITIES

**Cases**

*Am. Future Sys. Inc., v. Better Bus. Bureau*, 592 Pa. 66 (2007)…………………………..……15

*Andrako v. United States Steel Corp.,* 2008 U.S. Dist. LEXIS 37617 (W.D. Pa. May 8, 2008)…7

*Bair v. Purcell*, 500 F.Supp.2d 468 (M.D. Pa. 2007)…………………………………………………..7

*Bell v. Mayview State Hosp.*, 853 A.2d 1058 (Pa. Super. Ct. 2004)……………………………..17

*Beverly Enterprises, Inc. v. Trump*, 182 F.3d 183 (3d Cir. 1999)………………………………13

*Botwe–Asamoah v. University of Pittsburgh,* 2013 WL 5806464 (W.D. Pa. 2013)……………8-9

*Brophy v. Phila. Newspapers Inc.*, 281 Pa. Super. 588 (Pa. Super. Ct. 1980)……………………15

*Daywalt v. Montgomery Hosp.*, 573 A.2d 1116 (Pa. Super. Ct. 1990)…………………………17-18

*Di Bonaventura v. Consolidated Rail Corp.*, 372 Pa. Super. 420 (1988)…………………………8

*Elia v. Erie Ins. Exch.*, 634 A.2d 657 (Pa. Super. Ct. 1993)………………………………………...13

*Foster v. Thompson*, 2008 WL 4682264 (N.D.Okla. 2008)………………………………………11

*Garcia v. City of St. Paul*, 2010 U.S. Dist. LEXIS 46282 (D. Minn. May 10, 2010)……………12

*Garrison v. Louisiana*, 379 U.S. 64 (1964)………………………………………………………15

*Gilbert v. Bionetics Corp.*, 2000 U.S. Dist. LEXIS 8736 (E.D. Pa. Jun. 8, 2000)………………..18

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989)……………………………15

*Hartman v. Baker*, 766 A.2d 347 (Pa. Super. Ct. 2000)……………………………………....7

*Hunter v. Bowman,* 633 A.2d 655 (Pa. Cmwlth. 1993)……………………………………………..12

*Jenkins v. County of Schuylkill*, 441 Pa. Super. 642 (1995)………………………………………12

*Jones v. Johnson & Johnson*, 1997 U.S. Dist. LEXIS 13050 (E.D. Pa. Aug. 22, 1997)…………17

*Joseph v. Scranton Times L.P.*, 959 A.2d 322 (Pa. Super. Ct. 2008)……………………………..13

*Kafando v. Erie Ceramic Arts Co.,* 764 A.2d 59 (Pa. Super. Ct. 2000) …………………………..7

*Keeshan v. Home Depot, U.S.A., Inc.*, 2001 U.S. Dist. LEXIS 3607 (E.D. Pa. Mar. 27, 2001)….18

*Luteran v. Loral Fairchild Corp.*, 688 A.2d 211 (Pa. Super. 1997)………………………………8

*Miller v. City of Plymouth*, 2010 WL 1474205 (N.D. Ind. 2010)………………………………...11

*Morosetti v. Louisiana Land & Exploration Co.*, 522 Pa. 492 (1989)…………………………8, 9

*O'Brien v. Fifth Third Mortg. Co.*, 2015 U.S. Dist. LEXIS 63775 (E.D. Pa. 2015)….......7, 8, 9, 10

*Rizzo v. Haines*, 555 A.2d 58 (Pa. 1989) ………………………………………………..……...11, 12

*Sprague v. Porter*, 2013 Phila. Ct. Com. Pl. LEXIS 368 (Nov. 21, 2013)…………………...15, 16

*Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710 (Pa. Super. Ct. 2005)……………………7

*Sunlight Elec. Contracting Co. v. Turchi*, 918 F. Supp. 2d 392 (E.D. Pa. 2013)…………………11

*Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570 (E.D. Pa. 1999)……………………………17

*Synygy, Inc. v. ZS Assocs.*, 110 F. Supp. 3d 602 (E.D. Pa. 2015)……………………………13, 16

*Valjet v. Wal-Mart*, 2007 U.S. Dist. LEXIS 90845 (E.D. Pa. Dec. 11, 2007)……………………17

*Victor v. R.M. Lawler*, 2011 U.S. Dist. LEXIS 53133 (M.D. Pa. May 18, 2011)……………...19

## **Other**

42 Pa.C.S. § 8343(a)………………………………………………………………………………12

Fed. R. Civ. P. 50………………………………………………………………………………21

Pa. SSJI (Civ.) § 17.180………………………………………………………………………...13

I.      INTRODUCTION ................................................................................................... 1

II.     FACTUAL BACKGROUND .................................................................................. 2

        A.      Background on the Parties ............................................................................ 2

        B.      hibu Encounters Serious Financial Difficulty ............................................ 2

        C.      Plaintiff Aligns with an Ex-hibu Employee to Undermine hibu's Leadership .......... 3

        D.      hibu's Investigation Reveals Plaintiff's Disloyal Conduct and Results in
                Plaintiff's Termination ................................................................................ 5

        E.      Defendants Send an Email Communication to Employees About Plaintiff's
                Termination ................................................................................................. 6

III.    LEGAL ARGUMENT ........................................................................................... 7

        A.      Plaintiff Will Not Be Able to Prove At Trial That He Was Contractually
                Entitled to Severance Benefits, As Required for His WPCL Claim ...................... 7

                1.      Plaintiff Cannot Meet the High Threshold Necessary to Establish
                        That hibu's Alleged Unwritten Severance Policy Was An
                        Enforceable Contractual Agreement with Plaintiff ............................. 7

                2.      Plaintiff Was Not Subject To Any Other Written or Unwritten
                        Agreement Entitling Him to Severance ........................................... 11

        B.      Plaintiff Cannot Establish a Claim for Defamation ................................. 12

                1.      Plaintiff Cannot Prove That The Alleged Defamatory Statements
                        Were Made With Actual Malice Or That He Suffered Any Type of
                        Harm As A Result ........................................................................ 13

                        a.      Plaintiff Cannot Prove "Special Harm" in the Form of
                                Economic Damages ............................................................. 14

                        b.      Plaintiff Cannot Prove that Defendants Made the Allegedly
                                Defamatory Statements with Actual Malice, and Thus He
                                Will Be Required (At The Least) to Show "General
                                Damages" in the Form of Reputational Harm or Personal
                                Humiliation ........................................................................ 14

                        c.      Plaintiff Cannot Show That He Has Suffered Injury to
                                Reputation or Personal Humiliation ................................... 16

                2.      Plaintiff Cannot Establish That Defendants Abused Their Conditional
                        Privilege to Communicate with Employees About Relevant
                        Employment Matters ................................................................... 17

3.      The Evidence Will Show That The Statements in the Email are True
        and Therefore Not Defamatory.................................................................. 18

IV.     CONCLUSION ............................................................................................. 21

## I.      INTRODUCTION[1]

Defendants terminated Plaintiff's employment after an investigation revealed that Plaintiff was engaging in disloyal activities, including undermining hibu's senior leadership team, and working against the best interests of the company.  Plaintiff asserts two claims (i) a claim for unpaid severance under the Pennsylvania Wage Payment and Collection Law ("WPCL"); and (ii) a claim for defamation, alleging that Defendants defamed him in an internal email notifying hibu employees that his employment had been terminated after a "thorough investigation" into "conduct that the company considered to be disloyal and against the best interests of its employees and other stakeholders."   Plaintiff cannot meet his burden to prove either claim at trial.

First, Plaintiff will not be able to prove his claim under the WPCL because he cannot establish the basic prerequisites of any enforceable contract that entitles him to severance. Plaintiff admittedly had no written agreement entitling him to severance payments, and instead bases his claim on hibu's alleged "policy, pattern and practice" of paying severance.  But the law is clear that a "policy, pattern or practice" alone is not enough; it must be offered as a binding contract and satisfy other requirements under applicable Pennsylvania contract law principles. hibu's alleged policy does not satisfy these requirements, even crediting Plaintiff's anticipated testimony, as Plaintiff cannot point to any evidence that the policy was offered to him as a binding contract; that its terms are sufficiently definite to be enforced; or that he was eligible for severance under the policy (even under the terms as he describes them), given that he had not signed the release he maintained was necessary for receipt of the severance payments under this theory.

Plaintiff will likewise be unable to establish his defamation claim.  Plaintiff cannot offer

---

[1] Attached as Exhibits A and B to this Trial Brief are Defendants' Amended Witness List and Amended Exhibit List.

evidence demonstrating that he suffered any harm as a result of these statements or that Defendants abused their conditional privilege in making these statements.  Even if Plaintiff could establish these requisite elements, his claim still fails because the statements in the email were true.

## II.      FACTUAL BACKGROUND

### A.      Background on the Parties.

hibu Inc. is a print and digital media business located in King of Prussia, Pennsylvania. hibu plc was the parent company of hibu Inc. until late 2013, when it entered administration (a procedure akin to bankruptcy) pursuant to the law of the United Kingdom.[2]  Plaintiff began working for hibu in February 1984, and continued in various roles until 2011, when he became the Head of US/UK Operations for hibu.  Also in 2011, hibu appointed Mike Pocock as the group Chief Executive Officer.

### B.      hibu Encounters Serious Financial Difficulty.

As a result of the declining demand for print media, hibu plc began facing financial difficulties and refinanced its business in 2009.  In 2011, hibu appointed Mr. Pocock as the group CEO and tasked him and his senior leadership team with restructuring the business and formulating a new business strategy to help hibu survive. Mr. Pocock and his team instituted a series of changes, including a new digital strategy, in order to grow revenue to meet payments that were due to lenders.  As part of this process, Mr. Pocock and his team routinely met with third party consultants for guidance and obtained approval from hibu's Board of Directors for their strategy.

---

[2] For ease of reference, Defendants will refer to hibu Inc., hibu plc, and any predecessor entities as "hibu," except where the distinction between the entities is relevant.

A coordinating committee of lenders ("CoCom") formed as part of the financial restructuring.  All significant strategic business decisions undertaken by Mr. Pocock and his team thereafter were disclosed to CoCom and CoCom's advisors.  Included among the items disclosed to CoCom was an aggressive four-year projected revenue forecast for hibu.

Mr. Pocock and his leadership team held quarterly town hall meetings during which they would discuss the current state of hibu and invited employees to raise any questions at that time. If an employee did not feel comfortable voicing their concerns or questions about hibu's business strategy to Mr. Pocock and his team during a town hall meeting, the employee could alternatively utilize hibu's anonymous "Speak Up" hotline.

### C.     Plaintiff Aligns with an Ex-hibu Employee to Undermine hibu's Leadership.

Before his discharge, Plaintiff came to disagree with Mr. Pocock and his leadership team's turnaround efforts and, by his own admissions, began to engage in conduct that was disloyal to those efforts.  Rather than using any of the appropriate channels described above to voice his concerns, Plaintiff discussed hibu's business with Joe Walsh, hibu Inc.'s former Chief Executive Officer whose employment was terminated by Mr. Pocock in 2012.  Mr. Walsh, however, was not a neutral, disinterested party.  Both during and after his employment with hibu, Mr. Walsh tendered two offers to purchase hibu's U.S. business.  Despite the rejection of both his offers, Mr. Walsh remained interested in purchasing hibu's U.S. business up through Plaintiff's termination, and information about internal hibu issues was very valuable to him.

Given his focus on acquiring hibu, during this time period Mr. Walsh was actively reaching out to many of hibu's U.S. leadership team.  From January 30, 2012 through February 28, 2013, there were nearly 300 telephone calls and text messages between Mr. Walsh and various hibu U.S. executives, several of which took place while the hibu U.S. executives were attending confidential business strategy meetings.  Following these communications, Mr. Walsh

revealed his knowledge of confidential hibu information that had not yet been disclosed to the public, including anticipated headcount reductions and the suspension of a debt payment.

Plaintiff was aware of Mr. Walsh's interest in purchasing hibu's U.S. business, but nevertheless often spoke to him about the company and its leadership.  During the sensitive period while Mr. Pocock and his team were working with CoCom restructuring hibu's debt, Plaintiff remained in close contact with Mr. Walsh, speaking with him on his hibu work phone 23 times.  Among other things, Mr. Walsh also sent Plaintiff an email regarding Platinum Equity, the entity with whom Mr. Walsh submitted his first offer to purchase hibu's U.S. business, and told him that he was "terrific." Plaintiff also spent a weekend at Mr. Walsh's home in Maryland in the weeks before Mr. Walsh tendered his second bid to purchase hibu's U.S. business.

On February 28, 2013 at 12:35 p.m. EST, Mr. Walsh called Plaintiff after speaking with an advisor to CoCom and left a voicemail, in which he told Plaintiff that he had "managed to connect with the guys in the UK." Three minutes later, Mr. Walsh sent Plaintiff an email asking Plaintiff to call him. Upon seeing the email, Plaintiff immediately deleted Mr. Walsh's email both from his Inbox and his Deleted Items folder, even though it was not his standard practice to do so.  Plaintiff then called Mr. Walsh at 1:03 p.m. EST and spoke with him for 13 minutes. Less than 1.5 hours later, plaintiff ran a secure delete tool on his hibu-issued computer that permanently deleted files off of the computer.  Indeed, forensic analysis conducted on Plaintiff's hibu-issued computer demonstrated that this program removed files along with filenames in such a way that makes recovery of this data impossible.  Plaintiff thereby has prevented Defendants from knowing what data he erased from his hibu-issued computer.

Along with James McCusker, hibu Inc.'s President, Plaintiff provided substantial assistance to Mr. Walsh's efforts to purchase hibu's U.S. business.  As part of the campaign to

oust Pocock and purchase hibu, Mr. Walsh directed Mr. McCusker in various voicemail messages to "put together a list of all the CoCom member contact details" and "get as many of *our* leaders" to say that they "can't work another day for Mike Pocock." As described in the voicemails, the goal of the campaign was to have hibu employees "maul [CoCom]" and "deluge the switchboard" with complaints about Mr. Pocock, which would then aid Mr. Walsh's efforts to buy the company. Plaintiff possessed such a contact list. Plaintiff also participated in a conference call with Mr. Walsh and Mr. McCusker on December 4, 2012, when he and Mr. McCusker were participating in week-long strategy and business review meetings.

In further effort to aid Mr. Walsh's attempt purchase hibu's U.S. business, Plaintiff also became a vocal critic of Mr. Pocock internally among hibu employees. Among other things, Plaintiff led meetings to put pressure on hibu employees to rally against Mr. Pocock and he harshly criticized leadership's decisions in emails with fellow employees. Finally, Plaintiff furthered assisted Mr. Walsh's efforts by delaying implementation of the global strategy, missing key deliverables and maintaining a negative attitude during group meetings.

### D. hibu's Investigation Reveals Plaintiff's Disloyal Conduct and Results in Plaintiff's Termination.

Defendants were unaware of Plaintiff's disloyal actions until a former executive, acting anonymously, informed them that Mr. Walsh sought to purchase hibu's U.S. business once again, and that Plaintiff and Mr. McCusker were assisting Mr. Walsh's efforts by trying to rally employees against Mr. Pocock and his leadership team. The anonymous source further informed Defendants that Mr. Walsh was circulating "a spreadsheet containing the names and contact details of the CoCom members" with "[t]he aim [] to persuade CoCom that Joe [Walsh]'s bid is their best option." Notably, Plaintiff produced the effectively the same spreadsheet in discovery.

After receiving this information, Defendants commenced an investigation into Plaintiff's

and Mr. McCusker's conduct, which uncovered the emails, phone calls, and voicemails between Plaintiff, Mr. McCusker and Mr. Walsh.  Based on the investigation, it was clear that Plaintiff and Mr. McCusker had engaged in disloyal conduct, were actively undermining Mr. Pocock's efforts, and were working instead to help Mr. Walsh buy the company.  Defendants nevertheless decided to give Plaintiff and Mr. McCusker the opportunity to explain their actions.

On March 6, 2013, Mr. Christian Wells, hibu's General Counsel, and Mr. Malcolm Green, hibu's Global Head of Compliance, asked Plaintiff about his communications with Mr. Walsh.  Plaintiff refused to go through his communications with Mr. Walsh and did not provide credible explanations for his phone and email activity concerning Mr. Walsh.  As a result, Defendants terminated Plaintiff's employment after the interview.  Defendants also terminated Mr. McCusker's employment based on his interview and other information available to them.

### E.   Defendants Send an Email Communication to Employees About Plaintiff's Termination.

Because Plaintiff and Mr. McCusker were senior executives who were known among hibu's employees, on March 6, 2013 Mr. Pocock sent an email to hibu's U.S. employees notifying them of the termination of Plaintiff's and Mr. McCusker's employment (the "Email").  The Email, which forms the sole basis of Plaintiff's defamation claim, states in relevant part:

> I am writing to notify you of two changes in our Senior Management Team (SMT) which have immediate effect.  Jim McCusker and Mark Cairns have been dismissed today following a thorough investigation into conduct by them that the company considered to be disloyal and against the interests of its employees and other stakeholders.

Plaintiff claims that Defendants' statements in the Email that he was discharged after a "thorough investigation" for conduct the company "considered to be disloyal" and "against the best interests of the company" were false and defamed him.

III.   **LEGAL ARGUMENT**

   A.   **Plaintiff Will Not Be Able to Prove At Trial That He Was Contractually Entitled to Severance Benefits, As Required for His WPCL Claim.**

Plaintiff will not be able to prove at trial that he was contractually entitled to severance benefits, as required for his claim under the WPCL. "The WPCL does not create an employee's substantive right to compensation; rather, it only establishes an employee's right to enforce payment of wages and compensation to which an employee *is otherwise entitled by the terms of an agreement*." *Kafando v. Erie Ceramic Arts Co.,* 764 A.2d 59, 61 (Pa. Super. Ct. 2000), quoting *Hartman v. Baker*, 766 A.2d 347, 352 (Pa. Super. Ct. 2000)) (emphasis added). *See also Andrako v. United States Steel Corp.,* 2008 U.S. Dist. LEXIS 37617, at *22 (W.D. Pa. May 8, 2008) ("To state a PWPCL claim . . . Plaintiffs' claim for wages must be based on an underlying agreement.").

For severance benefits to be recoverable under the WPCL, the severance agreement underlying the plaintiff's claims must rise to the level of an enforceable contract under Pennsylvania contract law principles. *See O'Brien v. Fifth Third Mortg. Co.*, 2015 U.S. Dist. LEXIS 63775, at *24-30 (E.D. Pa. May 13, 2015) (granting defendant's motion for summary judgment on plaintiff's WPCL claim because employer's written severance policy did not rise to an enforceable contract); *Bair v. Purcell*, 500 F.Supp.2d 468, 493 (M.D. Pa. 2007) ("To present a valid claim under the WPCL, a plaintiff must establish "that he was contractually entitled to compensation and that [defendant] failed to pay the required compensation"), quoting *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 717 (Pa. Super. Ct. 2005).

   1.   *Plaintiff Cannot Meet the High Threshold Necessary to Establish That hibu's Alleged Unwritten Severance Policy Was An Enforceable Contractual Agreement with Plaintiff.*

Plaintiff asserts that he is owed severance payments due to an unwritten "established

policy, pattern, and practice of providing relatively uniform severance benefits to executives without employment contracts." *Compl.* ¶ 81. Plaintiff further asserts that the alleged policy was an "implied-in-fact" contract, which did not require "an offer and acceptance on the part of the parties."[3]

This is an inaccurate statement of the law. An employer's "policy, pattern and practice" alone is not enough to establish a contractual obligation under the WPCL. Plaintiff must clearly show that he and hibu intended to form a contract. *Di Bonaventura v. Consolidated Rail Corp.*, 372 Pa. Super. 420, 539 A.2d 865, 868 (1988) ("In cases involving implied contracts of employment, the litigant will be able to reach the jury only if he can show clearly that he and the employer intended to form a contract"). There is no presumption that, because (assuming *arguendo*) hibu had a severance policy, it intended to be legally bound by the policy, or that Plaintiff believed the policy was legally binding. *Luteran v. Loral Fairchild Corp.*, 688 A.2d 211, 214 (Pa. Super. 1997). Plaintiff instead must establish that hibu intended to offer the severance policy to him as a binding contract, and that hibu's offer was intentional, definite in its terms, and communicated to Plaintiff as an inducement for employment. *Morosetti v. Louisiana Land & Exploration Co.*, 522 Pa. 492, 495 (1989); *Botwe–Asamoah v. University of Pittsburgh,* 2013 WL 5806464, at *5 (W.D.Pa. 2013); *O'Brien*, 2015 WL 2337394, at *8.

Further, an employer's discretion to modify its severance policy, or to award severance only on a case-by-case basis, is sufficient to find that no enforceable agreement existed. *See O'Brien*, 2015 U.S. Dist. LEXIS 63775, at *27 (holding that defendant's unilateral revisions of its written severance policy "demonstrates that the terms of the Severance Policy were not

---

[3] Plaintiff made such an argument in his Opposition to Defendants' Motion for Summary Judgment, as well as further reference in the proposed jury instructions exchanged among counsel. Plaintiff's proposed instructions contained no support through cases in the applicable context – i.e., whether an employer policy may rise to the level of an enforceable contract. As explained *infra*, Plaintiff cannot establish the existence of an enforceable contract in this context.

appropriately definite for a reasonable employee to construe the Policy as a promise by the employer to be bound by it"). Finally, even if a policy is deemed to rise to the level of an enforceable contract, a plaintiff must prove that he or she was due severance under the specific terms of that contract. Id. at *31.

Under these standards, Plaintiff will not be able to prove that the alleged policy rose to the level of an enforceable contract entitling him to severance payments. First, there will be no evidence presented that (a) there even is a set severance policy or (b) even if there was, that a written (or even unwritten) severance policy was offered to Plaintiff as a binding contract. *Botwe-Asamoah*, 2013 WL 5806464, at *5 (W.D. Pa. 2013) (noting that for an employer's handbook policy to be "considered as part of a contract . . . it must be distributed for employees as inducement for employment as part of an offer"). Plaintiff will testify only that he was generally aware of various occasions in which certain employees were provided severance payments, but was not aware of all instances in which severance may or may not have been paid. A general awareness of some severance payments made by hibu is insufficient to establish that either hibu intended to be bound by any severance policy or that Plaintiff could reasonably consider such a policy to be an enforceable contract. *See Morosetti*, 564 A.2d at 152 (reversing trial court's directed verdict on WPCL claim, holding it was insufficient for employees to "base[] their belief and supposition as to its terms upon what occurred when various employees were, from time to time, given severance pay"); *O'Brien*, 2015 U.S. Dist. LEXIS 63775, at *22 ("An employer's intent cannot be proved 'by bits and pieces of their policy given individual employees at different times under varying circumstances'") (quoting *Morosetti*, 564 A.2d at 152-53). In sum, there will be no evidence presented of any offer by hibu, acceptance by Mr. Cairns, or consideration exchanged, as required to establish the existence of an enforceable agreement.

Second, Plaintiff acknowledges that, even under his theory of hibu's supposed severance policy, there were incidents in which terminated employees would not be offered severance. This acknowledgment reflects Plaintiff's understanding that, under the purported policy on which Plaintiff bases his claim, hibu had discretion to award severance benefits to particular employees depending upon the circumstances.  Mr. Wells will also testify that hibu formerly had a discretionary practice of sometimes providing severance benefits to employees who left as "good leavers" or "no-fault" leavers.  Thus, the evidence will show that hibu did not have any policy or practice of providing severance to *all* terminated employees, and a discretionary policy does not rise to the level of an enforceable contract.  *See O'Brien*, 2015 U.S. Dist. LEXIS 63775, at *27.

Third, even if he establishes that the policy rose to the level of an enforceable contract, Plaintiff will not be able to prove that he satisfied the requirements for payment under the policy. *Id.* at *32 (holding that, even if defendant's severance policy were held to be a contract, plaintiff was not due severance under its terms because he resigned).  To the extent that Plaintiff acknowledges that hibu had discretion in awarding severance benefits, he provides no argument for why he would merit such benefits under the circumstances of his termination, given his disloyal conduct.

Plaintiff also acknowledged that, even under his articulation of hibu's purported policy, hibu conditioned the provision of severance on an employee's execution of a release of claims, and thus if an employee chose not to execute a release, no severance was provided.  Plaintiff did not execute a release and accordingly, even under his recollection of the terms and conditions of the alleged severance policy, he did not satisfy a necessary requirement for receipt of a severance payment.

Moreover, given Plaintiff's articulation of hibu's policy, his WPCL claim and his

defamation claim are inconsistent.  That is, Plaintiff cannot prevail on his WPCL claim without

the finding that a payment of severance would have resulted in the release of the defamation

claim he also asserts.  Accordingly, even if Plaintiff prevails on both his WPCL and defamation

claims (despite his testimony that he has not satisfied a prerequisite for payment of the

severance), he will be required to elect a remedy on one claim but not the other.  *See Miller v.

City of Plymouth*, 2010 WL 1474205, at *8 (N.D. Ind. 2010) (noting that while a party may plead

and pursue inconsistent claims, "a party cannot recover separately on inconsistent theories when

one theory precludes the other"); *Foster v. Thompson*, 2008 WL 4682264, at *4 (N.D.Okla.

2008) (same).

### 2.      *Plaintiff Was Not Subject To Any Other Written or Unwritten Agreement Entitling Him to Severance.*

As described in more detail in Defendants' Motion *in Limine* No. 2, Plaintiff offered

some deposition testimony that directly contradicted the allegations of his Verified Complaint,[4]

in that he asserted that he based his WPCL claim in part on a combination of hibu's alleged

severance policy, as well as an alleged written employment agreement with Yell Group (hibu

Inc.'s predecessor company).  Plaintiff did not adduce during discovery, nor will he present at

trial, any evidence of the existence of this alleged written agreement.

As this self-serving testimony directly contradicts the sworn allegations of Plaintiff's

Verified Complaint, Defendants respectfully submit (as more fully argued in the Motion *in

Limine*) that testimony or argument related to the alleged agreement should be excluded.  *See

Sunlight Elec. Contracting Co. v. Turchi*, 918 F. Supp. 2d 392, 396 n.3 (E.D. Pa. 2013) ("It is

well-settled that judicial admissions, or factual assertions in a party's pleadings, are binding on

the party asserting them."); *Rizzo v. Haines*, 555 A.2d 58, 69 (Pa. 1989) ("Admissions of this

---

[4] Plaintiff explicitly averred in his Verified Complaint that he was *not* subject to a formal written employment agreement with hibu entitling him to severance; he did not bring any breach of contract claim; and he based his WPCL claim solely on the alleged hibu policy.

type, i.e., those contained in pleadings, stipulations, and the like, are usually termed 'judicial admissions' and as such cannot later be contradicted by the party who has made them. Such pleadings are conclusive in the cause of action in which they are filed."); *Hunter v. Bowman,* 633 A.2d 655, 657 (Pa. Cmwlth. 1993) ("admissions in pleadings constitute judicial admissions which cannot later be contradicted by the party who has made them"); *Garcia v. City of St. Paul,* 2010 U.S. Dist. LEXIS 46282 n.4, at *6 (D. Minn. May 10, 2010) (Plaintiffs' "deposition testimony directly contradict the allegations in the Complaint. Accordingly, the Court, as it must, disregards the inconsistent testimony and states the facts as alleged in the Complaint.").

In any event, even were Plaintiff's testimony in this regard admissible, he will not be able to prove that the alleged policy was an enforceable contract.  Plaintiff will testify that he never signed the alleged agreement; that he cannot recall the forms of severance, if any, it provided; and that he is unaware of whether such agreement is enforceable against hibu, the Yell Group's successor entity.  At the least then, the terms of this alleged agreement are insufficiently definite to be enforced.  *See Jenkins v. County of Schuylkill,* 441 Pa. Super. 642, 650 (Super. Ct. 1995).

In sum, Plaintiff cannot prove – whether on the basis of hibu's alleged unwritten policy or any other agreement – that he was contractually entitled to severance payments, as required for his WPCL claim.

### B.      Plaintiff Cannot Establish a Claim for Defamation.

In order to prove defamation, a plaintiff must demonstrate: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) the defendant's abuse of a conditionally privileged occasion. 42

Pa.C.S. § 8343(a) (2016); *Elia v. Erie Ins. Exch.*, 634 A.2d 657, 659 (Pa. Super. Ct. 1993).  Here, Plaintiff cannot, at the least, establish that he suffered any harm as a result of the statement, or that in sending the Email Defendants abused their conditional privilege to communicate to employees about relevant employment matters.  Further, Plaintiff's claim must also fail because the statement that he was "disloyal" to hibu was, in fact, a true statement, and truth is an absolute defense to a defamation claim.

    **1.**   ***Plaintiff Cannot Prove That The Alleged Defamatory Statements Were Made With Actual Malice Or That He Suffered Any Type of Harm As A Result.***

  The type of harm that a plaintiff must establish depends upon whether the allegedly defamatory statement constitutes defamation *per se* and whether the statement was made with "actual malice."  If the statement does not constitute defamation *per se*, a plaintiff must show that he suffered "special harm" as a result of the statement, *i.e.*, economic damages. *See Beverly Enterprises, Inc. v. Trump*, 182 F.3d 183, 188 (3d Cir. 1999) ("special damages are actual and concrete damages capable of being estimated in money, established by specific instances such as actual loss due to withdrawal of trade of particular customers, or actual loss due to refusal of credit by specific persons, all expressed in figures.") (internal quotation omitted).

  If the statement constitutes defamation *per se*, but is made without actual malice, "only general damages, *i.e.*, proof that one's reputation was actually affected by defamation or that one suffered personal humiliation, or both, must be proven . . ." *Synygy, Inc. v. ZS Assocs.*, 110 F. Supp. 3d 602, 613 (E.D. Pa. 2015), quoting *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 344 (Pa. Super. Ct. 2008).  However, if a defamatory statement is made with "actual malice," a defamation *per se* plaintiff need not offer proof of general damages, which will be presumed. Pa. SSJI (Civ.) § 17.180.

Here, Plaintiff will not be able to prove that Defendants' statements were made with actual malice, or that he suffered any type of harm as a result of them. As such, he will not be able to establish an essential element of his defamation claim.

    a.    *Plaintiff Cannot Prove "Special Harm" in the Form of Economic Damages.*

Plaintiff cannot prove that he suffered any "special harm" because he suffered no economic damages as a result of the statement. As an initial matter, during discovery Plaintiff was unable to identify any job or business opportunities lost a result of the Email. Moreover, within a month of his termination from hibu, Plaintiff worked for Access Holdings, a private investment firm. He also obtained paid consultancy work through his personal company, Treales LLC.

To the extent Plaintiff did not obtain a full-time position after his termination, this was due to a preexisting health condition which prevented him from working and was unrelated to his termination, and Plaintiff cannot present any evidence of actual job search efforts. Since September 2014, Plaintiff has been working for Joe Walsh at Dex Media, Inc., one of hibu's main competitors. Plaintiff works three days a week from his home and makes $212,000 per year in salary (which equates, on a full-time basis, to $353,333), with a potential to earn an additional $127,200 annually in bonus. While at hibu, Plaintiff worked full-time and his base salary was $323,595 and his bonus was $115,005. Plaintiff, therefore, earns more and works less in his current employment than he did while employed hibu.

    b.    *Plaintiff Cannot Prove that Defendants Made the Allegedly Defamatory Statements with Actual Malice, and Thus He Will Be Required (At The Least) to Show "General Damages" in the Form of Reputational Harm or Personal Humiliation.*

As noted above, if the alleged defamatory statements are considered defamation *per se*, then Plaintiff must establish "general damages" in the form of reputational harm or personal

humiliation.  If the defamatory *per se* statements are made with "actual malice," however, such general damages are presumed.[5]

Plaintiffs face a high bar in establishing "actual malice."  As set forth in *Sprague v. Porter*, and the Pennsylvania and United States Supreme Court decisions cited therein:

> Demonstrating actual malice is a difficult burden because it 'implies at a minimum that the speaker entertained serious doubts about the truth of his publication . . . . or acted with a high degree of awareness of . . . probable falsity'. . . . The focus in determining actual malice is not whether the statement was false but whether the publisher knew that the statement was false or probably false when it was published. A plaintiff cannot prevail without clear and convincing evidence of such a 'calculated falsehood.'

*Sprague v. Porter*, 2013 Phila. Ct. Com. Pl. LEXIS 368, at *56-57 (Nov. 21, 2013) (quoting and citing to *Am. Future Sys. Inc., v. Better Bus. Bureau*, 592 Pa. 66 n.6 (Pa. 2007); *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964); *Brophy v. Phila. Newspapers Inc.*, 281 Pa. Super. 588 (Pa. Super. Ct. 1980); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989).

Plaintiff cannot prove that Defendants made the statements with "actual malice."  As an initial matter (and as discussed in more detail below in § III.B.3), Defendants' statements were *in fact* true, and thus Plaintiff cannot prove they were made with "knowledge of falsity or reckless disregard of falsity…." *Sprague*, 2013 Phila. Ct. Com. Pl. LEXIS 368, at *59.  Further, it is undisputed that Plaintiff was a vocal critic of Michael Pocock and led a campaign to undermine him and the leadership team.  As Plaintiff cannot prove "actual malice," he must establish that he has suffered some form of harm from the statements, which he cannot do for the reasons discussed below.

---

[5] A showing of "actual malice" results in a presumption of only "general damages" in the form of reputational harm or personal humiliation, not "special (i.e., economic) damages."  Accordingly, if the statements are not defamatory *per se*, a plaintiff must establish economic damages whether or not the statements were made with "actual malice."

   c. *Plaintiff Cannot Show That He Has Suffered Injury to Reputation or Personal Humiliation.*

Plaintiff cannot show that he suffered any "general damages," *i.e.*, that his reputation was actually affected by the defamation or he suffered personal humiliation. *Synygy Inc. v. ZS Assocs.*, 110 F. Supp. 3d at 616. The case of *Sprague v. Porter* is again instructive on this point. In *Sprague*, the court found that a defamation plaintiff was unable to point to any injury to his reputation, or any form of emotional distress, sufficient to establish that he suffered harm as a result of the allegedly defamatory statement:

> The most evidence that Mr. Sprague proffered was that the article "upset" him and made him "furious." Personal upset is insufficient evidence of damages under the law. Thus, the lack of evidence of damages alone supports summary judgment on Mr. Sprague's claims. . . He provided no evidence of reputational damage even from his own witnesses . . . Not one witness was offered who claimed to think less of him after the article. Statements that the article was "capable" of damaging a person's reputation, without any evidence that it actually did, are insufficient to constitute evidence of reputational damage. Mr. Sprague's assertions that he was "upset" and suffered "intense emotional turmoil" without more are insufficient evidence of damages under the law. He lacked the requisite expert testimony to attest to his emotional harm. Whether an allegedly defamatory statement upsets one's friends has nothing to do with whether one has suffered actual damages. Mr. Sprague sought no damage to his business since he claimed that he currently had more cases than he could handle. His personal and family relationships were unchanged by the article. Mr. Sprague's own evidence thus undermines the very inference of damages he demands . . .

*Sprague*, 2013 Phila. Ct. Com. Pl. LEXIS 368, at *66-67 (internal citations omitted).

Plaintiff, like the plaintiff in *Sprague*, cannot point to any general damages sufficient to establish his defamation claim. Plaintiff testified that he cannot identify a single person who thought less of him or stopped respecting him as a result of the Email. He further testified that he remains friends with the people who contacted him after learning of the Email. Plaintiff also did not seek or require any medical, psychiatric and/or psychological treatment as a result of the Email.

In the absence of any evidence establishing the requisite element of harm, Plaintiff's

defamation claim will fail. *See ZS Assocs.*, 110 F. Supp. 3d at 616-17 (holding plaintiff proved neither special damages nor general damages where plaintiff presented no testimony that other companies or a third party "altered its opinion of [plaintiff] as a result of [defendant's] press release" and plaintiff ultimately found additional work even though defamatory press release required plaintiff to have "many more discussions" with companies to obtain work); *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 581 (E.D. Pa. 1999) ("Assuming <u>arguendo</u> that [statement] does constitute defamation <u>per se</u>… plaintiff's claim would still fail because plaintiff has not shown *general damages* – proof that one's reputation was actually affected by the slander or that one suffered personal humiliation.").

### 2.   *Plaintiff Cannot Establish That Defendants Abused Their Conditional Privilege to Communicate with Employees About Relevant Employment Matters.*

Plaintiff also cannot establish a *prima facie* claim of defamation because he cannot establish that Defendants abused their conditional privilege in making the alleged defamatory statements.  Pennsylvania courts recognize that communications from an employer to employees about relevant employment matters are privileged communications that are not actionable in a defamation case. *Valjet v. Wal-Mart*, 2007 U.S. Dist. LEXIS 90845, at *26-27 (E.D. Pa. Dec. 11, 2007); *Daywalt v. Montgomery Hosp.*, 573 A.2d 1116, 1118 (Pa. Super. Ct. 1990).  A communication is conditionally privileged when the publisher "reasonably believes that the recipient shares a common interest in the subject matter and is entitled to know" the information being communicated. *Daywalt*, 573 A.2d at 1118.  An allegedly defamatory statement must be examined in its context and whether the statement is capable of defamatory meaning can be decided as a matter of law. *Jones v. Johnson & Johnson*, 1997 U.S. Dist. LEXIS 13050, at *18, 35 (E.D. Pa. Aug. 22, 1997); *Bell v. Mayview State Hosp.*, 853 A.2d 1058, 1061-62 (Pa. Super. Ct. 2004).

The Email at issue in this matter was conditionally privileged. *See Daywalt*, 573 A.2d at 1118-19 (employer's communication concerning plaintiff's suspension was conditionally privileged because it was made to employees who had common interest in the matter).  Plaintiff was the Head of hibu's US/UK Operations, a long-time employee of hibu, and well-known throughout the company.  Further, he undermined hibu's executive leadership during a time when hibu was on the brink of insolvency and attempting to restructure its debts.  hibu's employees – knowing that it was a highly sensitive time within the company, concerned about the future of the company, and interested in the company's leadership structure and the reason for any changes – shared a common interest in knowing about Plaintiff's termination (including the surrounding circumstances).  Likewise, hibu management had a legitimate need to communicate that it needed its employees to be loyal to Mr. Pocock's plan at this critical juncture.  Defendants thus did not abuse the conditional privilege by sending the Email.

### 3.    The Evidence Will Show That The Statements in the Email are True and Therefore Not Defamatory.

Even if Plaintiff could establish the requisite elements of defamation, his claim will fail because the evidence will show that the purportedly defamatory statements in the Email were true.  "[T]ruth is an absolute defense to defamation." *Gilbert v. Bionetics Corp.*, 2000 U.S. Dist. LEXIS 8736, at *10 (E.D. Pa. Jun. 8, 2000).  Furthermore, complete truth is not required; so long as the statements at issue were made in good faith and are substantially true, Defendants cannot be found liable for defamation. *Id.*; *see also Keeshan v. Home Depot, U.S.A., Inc.*, 2001 U.S. Dist. LEXIS 3607, at *54-55 (E.D. Pa. Mar. 27, 2001) (holding defendants successfully asserted truth defense because statements regarding their belief that former employee engaged in fraudulent acts were the substantial truth and "the issue is not whether [plaintiff] committed a fraudulent act, but whether the Defendants honestly believed that [plaintiff] had committed a

fraudulent act in violation of company policy and terminated him on that basis").

The evidence will show that Plaintiff's conduct was in fact disloyal to hibu's ongoing strategic efforts, and thus his claim fails because the allegedly defamatory statements are true. First, Plaintiff will testify that he was in fact disloyal to, and a vocal critic of, Mr. Pocock and his leadership team.  During his employment, Plaintiff exchanged multiple emails with Mr. McCusker criticizing the leadership team, and tried to organize employees against Mr. Pocock. It is also undisputed that he spoke about hibu business to Mr. Walsh, even though Mr. Walsh was no longer an employee and had expressed a repeated interest in purchasing hibu's U.S. business. Plaintiff destroyed certain of the evidence related to his conduct by running a deletion program on his hibu-issued computer on February 28, 2013, an hour and a half after he received a call from Mr. Walsh.  Defendants will thus seek an adverse inference instruction allowing the jury to conclude that such activities were in fact in support of Mr. Walsh and disloyal to hibu's leadership. *See Victor v. R.M. Lawler*, 2011 U.S. Dist. LEXIS 53133, at *9 (M.D. Pa. May 18, 2011) (explaining when a court finds that a party spoliated evidence, it may issue a jury instruction that permits the jury to assume that the destroyed evidence would have been unfavorable to the position of the offending party).

Second, the evidence will show that Plaintiff's actions were indeed against the interests of hibu, as directed by Mr. Pocock.  Plaintiff will testify (as during his deposition) that Mr. Pocock, despite being the Group's Chief Executive Officer, was not entitled to any loyalty from hibu employees, and that Plaintiff owed a duty of loyalty only to the company, as Plaintiff himself chose to define it.  However, Plaintiff's undermining the leadership of Mr. Pocock and his senior team, and assisting the former President of the company to buy the company, even if Plaintiff thinks it was warranted under the circumstances, is consistent with the ordinary

definition of "disloyal."

Finally, to the extent that Plaintiff takes issue with hibu's description of its investigation into Plaintiff's conduct as "thorough," it is unclear how hibu's description of its own actions can be construed as defamatory against Plaintiff.   In any event, any dispute Plaintiff has with the term "thorough" has no factual basis, as there is no legitimate dispute that before terminating Plaintiff's employment, hibu reviewed Plaintiff's emails and telephone calls to investigate the allegations made by an anonymous source about Plaintiff's efforts to assist Mr. Walsh.  Plaintiff is also in no position to challenge whether or not the investigation was "thorough" as an objective matter, as he acknowledges that he did not have (nor has now) any personal knowledge of that investigation, or any general experience conducting corporate investigations himself.

Thus, because there are no false statements in the allegedly defamatory communication, Plaintiff will not be able to prove his claim of defamation.

## IV.    CONCLUSION

Defendants expect that Plaintiff's claim under the WPCL will fail on many grounds and not survive a motion under Fed. R. Civ. P. 50.  Simply put, Plaintiff will not be able to establish the basic prerequisites of an enforceable contract that entitles him to severance. Plaintiff will also not be able demonstrate that he suffered any harm as a result of the publication of the purported defamatory communication or that Defendants abused their conditional privilege in making the communication.  Even if he could, there are no false statements in the communication.


Dated: August 8, 2016                         Respectfully submitted,

                                               */s/ Bret A. Cohen*
                                               Bret A. Cohen (admitted *pro hac vice*)
                                               Gauri P. Punjabi (admitted *pro hac vice*)
 MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
 AND POPEO, P.C.
 One Financial Center
 Boston, MA  02111
 Telephone: (617) 542-6000
 bacohen@mintz.com
 gppunjabi@mintz.com

 William M. McSwain
 David J. Woolf
 Dennis M. Mulgrew, Jr.
 DRINKER BIDDLE & REATH LLP One Logan
 Square, Suite 2000
 Philadelphia, PA  19103-6996
 Telephone: (215) 988-2700
 William.McSwain@dbr.com
 David.Woolf@dbr.com
 Dennis.Mulgrew@dbr.com

86243284.7

21

## <u>CERTIFICATE OF SERVICE</u>

I, Dennis M. Mulgrew, Jr., do hereby certify that a true and correct copy of the foregoing Trial Brief was served upon counsel for the Plaintiff via ECF and electronic mail at the addresses indicated below.

Clifford E. Haines, Esquire
Danielle Weiss, Esquire
Haines & Associates
Widener Building, 5th Floor
1339 Chestnut Street
Philadelphia, PA  19107
chaines@haines-law.com
dweiss@haines-law.com

         */s/ Dennis M. Mulgrew, Jr.*
         Dennis M. Mulgrew, Jr.

Dated: August 8, 2016